

**WILCOX & FETZER LTD.**

In the Matter Of:

# Mahoney

## v.

# Benjamin Banneker Elementary School and Milford School District

## C.A. # 05-163 GMS

---

## Transcript of:

## James G. Mahoney, Sr.

## February 13, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com



**EXHIBIT**

ALL-STATE LEGAL®

*C*

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4    JAMES MAHONEY and                    )
      TINA MAHONEY, h/w,                   )
 5                                         )
               Plaintiffs,                 )
 6                                         ) Civil Action
      v.                                   ) No. 05-163 GMS
 7                                         )
      BENJAMIN BANNEKER ELEMENTARY         )
 8    SCHOOL and MILFORD SCHOOL DISTRICT,  )
                                           )
 9             Defendants, Third-Party     )
               Plaintiffs,                 )
10                                         )
      v.                                   )
11                                         )
      PLYMOUTH ENVIRONMENTAL CO., INC.,    )
12                                         )
               Third-Party Defendants.     )
13
14
15              Deposition of JAMES G. MAHONEY, SR.
      taken pursuant to notice at the law offices of White
16    and Williams LLP, 824 North Market Street, Suite 902,
      Wilmington, Delaware, beginning at 1:25 p.m. on
17    Monday, February 13, 2006, before Kurt A. Fetzer,
      Registered Diplomate Reporter and Notary Public.
18
      APPEARANCES:
19
               MARC H. SNYDER, ESQ.
20             FRANK ROSEN SNYDER & MOSS, L.L.P.
                 8380 Old York Road - Suite 410
21               Elkins Park, Pennsylvania  19027
                 For the Plaintiffs
22
23                      WILCOX & FETZER
           1330 King Street -  Wilmington, Delaware 19801
24                      (302) 655-0477
```

Page 2

1  APPEARANCES: (Cont'd)
2      WILLIAM L. DOERLER, ESQ.
       WHITE AND WILLIAMS LLP
3      824 North Market Street - Suite 902
       Wilmington, Delaware 19801
4      For the Defendants and Third-Party Plaintiffs
5  ALSO PRESENT:
       TINA MAHONEY
6

       - - - - -

7          JAMES G. MAHONEY, SR.,
8      the deponent herein, having first been
9      duly sworn on oath, was examined and
10     testified as follows:
11          EXAMINATION
12  BY MR. DOERLER:
13     Q.  Mr. Mahoney, thank you for coming in.  As you
14  know, I'm Bill Doerler and I'm representing the school
15  district in this case.
16          You heard the directions before from
17  Mr. Snyder to the other deponents, but I will just
18  repeat them briefly.  Please answer verbally as
19  opposed to shaking your head so that Mr. Fetzer can
20  get it down.
21          And also if you don't understand a
22  question that I have asked you, please ask me to
23  rephrase it and let's try and each of us speak at one
24  a time.  I tend to sometimes try to cut you off, but I

Page 3

1  will work not to do that so that he can get down each
2  of our responses and questions.
3          Could you please state your full name and
4  address for the record, please?
5     A.  James G. Mahoney, Sr.
6     Q.  And your address?
7     A.  1125 Maple Avenue, Atco, New Jersey.
8     Q.  Where do you presently work?
9     A.  Plymouth Environmental.
10    Q.  What's your title there?
11    A.  Supervisor.
12    Q.  Is there anything before that?  Is it a project
13  supervisor or just a supervisor?
14    A.  Just supervisor.
15    Q.  How long have you been a supervisor?
16    A.  With Plymouth?
17    Q.  Yes.  Start with that.
18    A.  Approximately ten years.
19    Q.  And during that time have you been supervising
20  asbestos abatement?
21    A.  Asbestos, lead and sometimes mold.
22    Q.  And can you just briefly tell me what exactly
23  Plymouth Environmental does?
24    A.  We focus on mainly lead and asbestos abatement

Page 4

1  projects.
2     Q.  Now you're starting to do some mold work?
3     A.  They're dabbling in it, yes.
4     Q.  And it's my understanding that you're licensed?
5     A.  Yes.
6     Q.  Licensed in a couple of different states I
7  understand, correct?
8     A.  Correct.
9     Q.  What does being licensed entail?
10    A.  You have to go through a 40-hour course, pass a
11  state exam.
12    Q.  Let me stop you there.
13          We're talking about licensing for asbestos
14  abatement?
15    A.  Correct.
16    Q.  I'm sorry.  Finish your answer.
17    A.  You have to pass a state exam and apply for a
18  work permit.
19    Q.  All right.  Who did you work for before
20  Plymouth?
21    A.  Only two other companies.  Resource Management
22  Incorporated.
23    Q.  Okay.
24    A.  And Duall Maintenance.

Page 5

1     Q.  For those companies were you also doing
2  asbestos abatement?
3     A.  Yes.
4     Q.  Were you a supervisor for Resource Management?
5     A.  Yes.
6     Q.  Were you a supervisor for Duall Maintenance?
7     A.  I started with Duall Maintenance as a laborer,
8  worked for about a year and a half, became an inside
9  foreman and went from that after about a year and a
10  half to supervisor.
11    Q.  And you said you worked for Plymouth for about
12  ten years.  How long did you work for Resource
13  Management?
14    A.  To the best of my knowledge, I think it was
15  between two and five years, in that area.
16    Q.  Where is Resource Management located?
17    A.  They're no longer in business.
18    Q.  Were they a New Jersey company?
19    A.  Yes.
20    Q.  Duall Maintenance, how long did you work for
21  them?
22    A.  From 1986 to approximately 1992 or '93.
23    Q.  Where is Duall Maintenance located?
24    A.  They were located in Maple Shade, New Jersey.

2 (Pages 2 to 5)

Page 6

1   Q.  They're also out of business?
2   A.  Yes.
3   Q.  You talked about 40 hours of training in
4   asbestos abatement, correct?
5   A.  Correct.
6   Q.  Who gave you that training?
7   A.  Originally?
8   Q.  Yes.
9   A.  For Delaware I went to Delaware Technical
10  Institute.
11  Q.  All right.  And is it my understanding that
12  each state has its own testing requirements?
13  A.  (The witness nodded.)
14  Q.  You have to answer yes verbally.
15  A.  I'm sorry.  Yes.
16  Q.  So if you pass the test in New Jersey you don't
17  automatically become licensed in Delaware; you have to
18  take Delaware's test?
19  A.  Correct.
20  Q.  When did you pass Delaware's test?
21  A.  I can't recall.
22  Q.  Do you have a rough estimate?  Was it ten years
23  ago?
24  A.  It was probably between ten and fifteen years

Page 7

1   ago.
2   Q.  So do you know if you were still with Duall
3   Maintenance when you passed it?
4   A.  I don't recall.
5   Q.  When you said Delaware Technical Institute, is
6   that Delaware Technical Community College?
7   A.  Correct.
8   Q.  Do you have to have ongoing training?
9   A.  You have to have a refresher in each state each
10  year.
11  Q.  Refresher course?
12  A.  Yes.
13  Q.  But you don't have to be tested again?
14  A.  No.  The school gives you a test, but it's not
15  a state-required test.
16  Q.  So your licensing after the initial test
17  doesn't depend on whether you pass the test at the end
18  of the refresher course?
19  A.  Correct.
20  Q.  And with respect to job site safety what is the
21  training on that?  Let me rephrase that question.
22      Do you get job site safety training at
23  this 40-hour course?
24  A.  They cover it, yes.

Page 8

1   Q.  And can you tell me just generally what types
2   of things they cover?
3   A.  We go over slips, trips and falls, the
4   electricity issues, basic first aid, CPR, normal
5   issues that are concerns on job sites.
6   Q.  With respect to slips, trips and falls, why is
7   that important training in an asbestos abatement
8   environment?
9   A.  Because you're working on a lot of wet, in a
10  lot of wet conditions on plastic sheathing.
11  Q.  Would I be correct in saying that somebody
12  working in an asbestos abatement project would have a
13  heightened sense of awareness for slips and falls?
14      MR. SNYDER:  Objection to the form of the
15  question.
16  A.  Could you rephrase the question?
17  Q.  Okay.  Somebody who works in an asbestos
18  abatement project, do they have to pay more attention
19  than, say, the average person with respect to where
20  they're walking looking for trips and hazards, trips
21  and --
22      MR. SNYDER:  Same objection.
23  Q.  -- tripping hazards?
24  A.  No, I don't believe so.

Page 9

1   Q.  Why do you say that?
2   A.  It's a matter of safety training on every job.
3   Q.  So every job site should have safety training
4   on tripping hazards and slips and falls.  Is that
5   correct?
6   A.  I believe so.
7   Q.  And the training that you received for asbestos
8   abatement and safety issues, was that limited to the
9   abatement project itself, the contained field?
10  A.  Are you referring to Banneker Elementary or
11  this business in general?
12  Q.  I'm talking just generally right now about
13  safety training.  When you received the training is it
14  limited to looking for hazards?  Let me rephrase this
15  question.
16      When you're doing an asbestos abatement
17  project you have a contained area at some point,
18  correct?
19  A.  Correct.
20  Q.  And what goes on --
21  A.  Well, not in all phases of abatement do you
22  have a containment.
23  Q.  Okay.  When is an area contained during an
24  abatement project?

3 (Pages 6 to 9)

Page 10

1   A.  When you're doing gross removal.
2   Q.  What kind?
3   A.  When you're doing gross removal.
4   Q.  You mean actually tearing out the asbestos?  Is
5   that what "gross removal" means?
6   A.  You can remove asbestos via glove bag with just
7   a tented area.  They're a lot of different phases to
8   this business.
9   Q.  So there are points in which you as an
10  abatement company are working on a project where
11  you're not within a contained area?  When I say, "a
12  contained area," I'm referring to like an area
13  surrounded by plastic.
14  A.  Correct.
15  Q.  In the documents I received from the school
16  district I received what appears to be a brief
17  synopsis of your qualifications.
18      Would you take a look at that and tell me
19  if you recognize that?
20  A.  (Reviewing document)  Yes.
21  Q.  All right.  So you recognize that as something
22  that Plymouth Environmental provides to companies that
23  it's going to do work for?
24  A.  I believe so, yes.

Page 11

1   Q.  Have you ever seen this before?
2   A.  No.  That specific letter, no.
3   Q.  You have seen something similar to that?
4   A.  I'm assuming that -- I've seen letters like
5   this written by my company.
6   Q.  Is there anything in the description that has
7   your name above it that you disagree with?
8   A.  No.
9   Q.  All right.  In the middle of the paragraph
10  there's a sentence that says, "He is responsible for
11  ensuring worker safety through strict accordance with"
12  it says, "health our and safety manual."  I believe
13  that probably should read "our health and safety
14  manual."
15      Do you agree with that statement?
16  A.  Yes.
17  Q.  So you're familiar with what's in Plymouth
18  Environmental's health and safety manual.  Is that
19  correct?
20  A.  I've read it, yes.
21  Q.  It talks about NESHAP regulations.  Can you
22  tell me what that stands for?
23  A.  That's the NESHAP regulations.
24  Q.  What does NESHAP, what's that short for?

Page 12

1   A.  What does it stand for?
2   Q.  Yes.
3   A.  National Emissions -- let me see.
4       Where's it at?  National Emissions
5   Standard, I believe.  I can't remember what the last
6   three letters are for.  I am familiar with the regs,
7   though.
8   Q.  What do those particular regulations regulate?
9   The NESHAP, what do they attempt to regulate?
10  A.  It's pretty much regulating asbestos abatement
11  work in schools and hazardous air pollutants and, as a
12  matter of fact, that's what the last three letters
13  stand for, National Emissions Standard for Hazardous
14  Air Pollutants.  I'm sorry.
15  Q.  And are there specific regulations under NESHAP
16  for school asbestos abatement?
17  A.  It's under AHERA.
18  Q.  Say that again.
19  A.  It's under AHERA and ASHARA.
20  Q.  Give me the letters for those.
21      MR. SNYDER:  What was it?
22  A.  A-H-E-R-A.
23  Q.  Yes.
24  A.  I'm trying to -- I remember what it stood for

Page 13

1   when it was brought up earlier.  I'm trying to think
2   now.  Asbestos Hazard Emergency Response Act is what
3   AHERA stands for.
4   Q.  There was a second one.  I asked you a question
5   about --
6   A.  That doesn't pertain to Delaware.  It's a whole
7   different reg.
8   Q.  So the only one applying to Delaware is this
9   AHERA?
10  A.  As far as I know, other than their state
11  regulations.
12  Q.  Meaning Delaware's state regulations?
13  A.  Correct.
14  Q.  And these AHERA regulations have regulations
15  specific to abatement in schools?
16  A.  Correct.
17      MR. DOERLER:  I'm going to have that
18  marked as Defendant's 1.
19      .  (Defendant's Deposition Exhibit No. 1 was
20  marked for identification.)
21  BY MR. DOERLER:
22  Q.  On this particular site at the Banneker School
23  when was was the first time you were on the project?
24  A.  The first time I was at the school?

4 (Pages 10 to 13)

Case 1:05-cv-00163-GMS    Document 38-7    Filed 05/26/2006    Page 6 of 24

Mahoney                                                    v. Benjamin Banneker Elementary School and Milford School District
James G. Mahoney, Sr.                    C.A. # 05-163 GMS                                February 13, 2006

Page 14

1    Q.   Yes.
2    A.   On June 30th. I believe.
3    Q.   All right. There was a preconstruction meeting
4    it looks like on June 10th. Were you at that meeting?
5         MR. SNYDER: Off the record.
6         (Discussion off the record.)
7         THE WITNESS: I can't say for sure. I may
8    have been there.
9    BY MR. DOERLER:
10   Q.   You're not on the attendance list. That's why
11   I am just trying to figure out if you were there.
12   A.   I don't believe I was, but I may have. I don't
13   know. I don't recall.
14   Q.   There's somebody named Andy --
15   A.   Lunnutti.
16   Q.   Lunnutti. Who is Andy Lunnutti?
17   A.   Now? He's no longer affiliated with the
18   company. At the time he was the vice president.
19   Q.   And do you know what type of an inspection
20   Mr. Lunnutti would have done at a preconstruction
21   meeting?
22   A.   No, I can't speak for him.
23   Q.   Have you ever been to a preconstruction
24   meeting?

Page 15

1    A.   Yes.
2    Q.   For an asbestos abatement project?
3    A.   Yes.
4    Q.   And what type of things typically occur at a
5    preconstruction meeting with respect to walking around
6    the site and inspecting the site itself?
7    A.   That's usually directed by the consultant. It
8    varies from job to job.
9    Q.   In this case the consultant was Harvard?
10   A.   Correct.
11   Q.   Have you ever been on a preconstruction meeting
12   with Harvard on another site?
13   A.   I don't recall.
14   Q.   Do you know if these meetings involved
15   inspections of the areas outside the building?
16   A.   Rarely.
17   Q.   In what type of a situation would a
18   preconstruction meeting involve an inspection outside
19   of the building?
20   A.   If our scope of work falls, if we have a scope
21   of work that falls outside the building.
22   Q.   And, for instance, if there were shingles on
23   the outside of the building? Is that a situation?
24   A.   Yes. Again, they're directed by the

Page 16

1    consultant.
2    Q.   Do you have any familiarity with what Harvard
3    did with respect to inspecting outside of the building
4    in this particular case?
5    A.   At the preconstruction meeting?
6    Q.   Just in general.
7    A.   To my knowledge, no. I have no idea.
8    Q.   It's my understanding that Harvard had somebody
9    on site, a Mr. Camby, correct?
10   A.   Correct.
11   Q.   Did you ever speak with Mr. Camby about any of
12   the conditions on the property outside of the property
13   prior to July 15 of 2003?
14   A.   In retrospect to what? The integrity of the
15   property?
16   Q.   Just any conditions that you thought were a
17   concern.
18        MR. SNYDER: Objection to the form of the
19   question.
20        MR. DOERLER: I'll rephrase the question.
21   BY MR. DOERLER:
22   Q.   Do you recall any conversations that you had
23   with Mr. Camby about conditions of the outside of the
24   building that you thought were a concern with respect

Page 17

1    to safety issues prior to July 15 of 2003?
2    A.   No. Not to my recollection.
3    Q.   In the preconstruction meeting minutes that I
4    have here it says that PEI, which I believe stands for
5    Plymouth Environmental, Inc., will review workloads
6    and provide Jim Mahoney the opportunity to visit the
7    site for job loading purposes.
8         Can you explain to me what that means?
9    A.   That's just mobilization of the equipment.
10   Q.   Mobilization of the equipment?
11   A.   Yes.
12   Q.   Did you have an opportunity to visit the site
13   for that purpose prior to June 30th?
14   A.   I don't recall.
15   Q.   What types of things would you need to see the
16   site for with respect to mobilization of equipment?
17   A.   As far as the building where I'm going to be
18   working to develop a work plan of where I'm going to
19   start, how I'm going to set up and discuss with the
20   building owners what their needs were.
21   Q.   In this case you don't have any recollection of
22   meeting with anybody about setting up or where to put
23   your equipment prior to June 30th?
24   A.   Prior to? No, I don't recall.

5 (Pages 14 to 17)

Mahoney                                    v. Benjamin Banneker Elementary School and Milford School District
James G. Mahoney, Sr.                      C.A. # 05-163 GMS                      February 13, 2006

Page 18

1    Q. It also indicates that PEI's detailed work plan
2    will be developed and submitted for review prior to
3    mobilization consistent with contract documents.
4         Do you recall preparing a work plan in
5    this particular case?
6    A. If that was the case, if it was required prior
7    to the start of work, that's something that
8    Mr. Lunnutti would have handled.
9    Q. He would actually have prepared the work plan?
10   A. Or at least discussed at length with Harvard
11   and the school district where we were going to start
12   and what we were going to do as per what our needs
13   were for moving into the building.
14   Q. I'm going to hand you what's been marked as
15   Marinucci 1. You will notice Mr. Marinucci marked
16   something on the left side of the document called
17   office area.
18        Is that where you worked out of?
19   A. Myself and Mr. Camby.
20   Q. So you each had a desk in this corner office?
21   A. Correct.
22   Q. All right. Where did you bring your equipment
23   into the building?
24   A. Right through the front set of doors. There

Page 19

1    was a doorway located here (indicating).
2    Q. I'll guess I'll hand you my drawing.
3         MR. DOERLER: Let's mark this as
4    Defendant's 2.
5         (Defendant's Deposition Exhibit No. 2 was
6    marked for identification.)
7    BY MR. DOERLER:
8    Q. Can you make some type of a notation where you
9    brought your equipment into the building?
10   A. (Witness complies).
11   Q. And you heard Mr. Marinucci testify about some
12   type of a door being used as a ramp. Is that the area
13   that that occurred?
14   A. I don't recall. I don't recall a door being
15   used as a ramp.
16   Q. Do you recall there being steps in this
17   location?
18   A. Yes, I do.
19   Q. And how did your equipment get up those steps?
20   A. I backed the truck up as close to the steps
21   as -- one of my gentlemen backed the truck up as close
22   as they could to the steps. I don't exactly remember.
23   My truck gets hand unloaded. There's no lift gate on
24   it.

Page 20

1    Q. Do you recall how close to this door you were
2    able to get with the truck?
3    A. I don't believe I was the one who backed the
4    truck up. It would have been one of my workers
5    because more than likely at that time I was walking
6    around with Mr. Camby setting up all of the
7    appropriate paperwork.
8    Q. Is your equipment only offloaded one time on
9    the job?
10   A. No. It just depends.
11   Q. All right. So do you have any idea whether, do
12   you recall how the equipment moved in and out
13   throughout the project?
14   A. I'm sure we used several different doors.
15   Q. Do you have any specific recollection?
16   A. No.
17   Q. Is there anyone that was working at the project
18   with you that might have a better recollection?
19   A. I don't know. I can't speak for anyone else.
20   Q. You were on the project every day?
21   A. To the best of my knowledge, yes.
22   Q. Mr. Marinucci drew a door on Marinucci 1.
23   Well, not really. He drew a loading dock and then he
24   drew the stairs where he believes the photographs that

Page 21

1    were produced show that your wife fell.
2         Do you agree with the location of those
3    stairs?
4    A. Within reason, yes. I can't say exactly where
5    they're at, but they look close approximately.
6    Q. You agree when you came out of the door from
7    the gymnasium there was kind of a parking lot and
8    loading dock on your left-hand side? Do you agree
9    with that?
10   A. Yes.
11   Q. You walked across the parking lot area and down
12   the stairs. You agree with that?
13   A. Yes.
14   Q. And do you recall at any time taking materials
15   out of this gymnasium door?
16   A. Do I recall taking materials out of that
17   gymnasium door?
18   Q. Materials or equipment.
19   A. I'm sure we did because this became one of our
20   work areas at some point.
21   Q. Just a clarification. Do you
22   mean Mr. Mahoney himself or anybody from Plymouth
23   Environmental?
24   Q. Anybody from Plymouth Environmental?

6 (Pages 18 to 21)

Page 22

1    A.  I'm sure.  I can't remember specifically
2    whether we used this door or this door (indicating) or
3    if we brought it down the hallway.  I don't recall
4    exactly how we got our equipment into that room, but
5    I'm sure we did at one time have equipment in it.
6    Q.  So it could have come in through the door on
7    the right side or some other door, but you're not
8    sure, correct?
9    A.  Correct.
10   Q.  It's my understanding that at the bottom of
11   these stairs that were drawn in there was another I
12   guess macadam area, parking area.
13        Did Plymouth Environmental have any
14   equipment or things parked at the bottom of those
15   stairs?
16   A.  No, we did not.  Not right at the bottom of
17   those stairs, no.
18   Q.  Did you have it parked somewhere in the
19   vicinity of those stairs?
20   A.  We had a waste trailer somewhere back further
21   in the parking lot.
22   Q.  Why don't you draw in where the waste trailer
23   was on --
24   A.  Based on this diagram, I can't give you an

Page 23

1    exact location.  There was another, there's another
2    diagram of a lower floor and I don't know the exact
3    layout of that lower floor.
4    Q.  It's a diagram of the lower floor?
5    A.  Correct.
6    Q.  Do you know where what you're talking about was
7    in respect to the kitchen?
8    A.  No, I don't.  All I know is it was in this back
9    corner somewhere.  How it was situated and exactly
10   what section of this it was under, I don't recall.
11   And I don't know how this parking lot was laid out in
12   reference to this (indicating) by this diagram.
13   Q.  Okay.  When your wife fell do you know, was she
14   on a specific assignment for you at that time?
15   A.  What had happened to the best of my knowledge
16   is I was in the building checking on one of my work
17   areas.  One of my employers asked her to help him go
18   line a trailer that was in the lower parking lot.
19   They had no other access to get to the lower parking
20   lot other than those stairs because this (indicating)
21   stairwell had been previously blocked off.
22   Q.  When you say one of your employers?
23   A.  One of my employees.
24   Q.  What does line a trailer mean?

Page 24

1    A.  In other words, put two layers of poly in the
2    trailer.  It's a state law in order to put waste into
3    the trailer to go to the landfill.
4    Q.  All right.  This trailer was parked in the area
5    where you told me you couldn't make a drawing?
6    A.  Exactly.  I can't tell you, I can't give you an
7    idea of where it was based on these sketches because I
8    don't know how the bottom floor was laid out, how far
9    it came out.  It doesn't show the parking lot area.  I
10   mean, this is a hypothetical.
11   Q.  Did you do abatement on this lower floor?
12   A.  Yes, we did.
13        MR. DOERLER:  Let's go off the record.
14        (Discussion off the record.)
15   BY MR. DOERLER:
16   Q.  You said that there were some stairs blocked.
17   Are these the stairs that you were talking about?
18   A.  Based on -- again, I'm making an educated guess
19   based on where this lower section of the floor would
20   be.  I can tell you --
21   Q.  So you're telling me just generally when you
22   say that this area was back here, you're referring to
23   behind the loading dock and the kitchen up in the
24   right-hand corner of the picture somewhere?

Page 25

1    A.  The way the building was laid out I would guess
2    that this (indicating) portion of the building was
3    back in here somewhere and I'm just basing it off of
4    looking at this diagram.
5    Q.  All right.
6        MR. DOERLER:  Let's go off the record for
7    a second.
8        (Discussion off the record.)
9    BY MR. DOERLER:
10   Q.  I'm going to ask you to draw, if you can,
11   roughly the area, if you could just sketch out the
12   back of the building where you're talking about and
13   where you parked.  Is that possible for you to do?
14   A.  We didn't park down there.  The main parking
15   lot -- again, the main parking lot where my employees
16   parked and where my truck was parked the majority of
17   the time was right in front of the building.  There's
18   an area of lawn with shrubs all along the front of the
19   building and then there's an entrance to a parking,
20   from the road there's an entrance to a parking area,
21   I'm going to guess somewhere in here (indicating).
22   And it ran the length of this building and then
23   there's an entrance down here (indicating).  We used
24   the front parking area.

7 (Pages 22 to 25)

Page 26

1   Q.  So could you just kind of write across here
2   front parking wherever you think the parking was and
3   draw like a little rectangle or something?
4      A.  I'm going to assume it was like this (drawing
5   on diagram).  This would be the road out of there.
6      Q.  Okay.
7      A.  Again, this ain't going to be perfect.  And
8   there are parking spaces along here (indicating) and
9   along here.  And I had a waste trailer located right
10  here.
11     Q.  Just for the record, he's drawing on
12  Defendant's 2.
13         A waste trailer?
14     A.  Correct.
15     Q.  Could you just write the word "trailer" in that
16  rectangle?
17     A.  (Witness complies)
18     Q.  Where this arrow is that you say you went in
19  the building, was there a sidewalk out to the
20  driveway?
21     A.  Yes.  To the best of my knowledge, there was.
22     Q.  Do you know if your employees drove the truck
23  over the sidewalk?
24     A.  I don't know.

Page 27

1   Q.  Do you know who would have been in charge of
2   delivering equipment, which of your employees?
3      A.  It would have been my truck.  I had
4   approximately anywhere from six to twelve employees on
5   that job.  There were several of them that could have
6   driven the truck.
7      Q.  You don't recall which one at this point?
8      A.  No, I don't.
9      Q.  All right.  It's my understanding that most but
10  not all of your equipment was parked in this parking
11  area where you just drew in.  Is that correct?
12     A.  As far as equipment, could you rephrase that
13  question?  What do you mean by "equipment"?
14     Q.  Well, the equipment that you would use in here.
15  Let me try and rephrase that.
16         Your vehicles, trailers and trucks, they
17  would be parked in the front of this building where
18  you just drew in?
19     A.  I know I had a waste trailer here to handle
20  most of the waste from the upper floors of this
21  building.  My work truck usually always got parked out
22  here (indicating).  My employees' vehicles got parked
23  out here.
24         There was a lower parking lot for the

Page 28

1   lower section of this building.  At some point, and I
2   don't remember what exact date, but we had a trailer
3   come in and be put in this lower parking lot to handle
4   the waste that was going to come out of that lower
5   end.
6      Q.  A second trailer?
7      A.  Correct.
8      Q.  Is that the only piece of equipment, vehicles
9   or trucks that was parked in this lower parking lot?
10     A.  Yes.
11     Q.  What phase did you bring that in for?
12     A.  I don't recall the exact phasing of the job.
13     Q.  What would you need to see to refresh your
14  recollection on the phasing of the job?
15     A.  I'm sure my logs would reflect it, my logs or
16  the original prints that we had marked up during the
17  phasing of the job.
18     Q.  I'm going to hand you some, these are some but
19  not all of the daily log and safety reports that I was
20  produced, I should say I received.
21         Does a review of these refresh your
22  recollection at all with respect to what phase of the
23  job you would have brought this other trailer in for?
24     A.  I don't remember what number I would have

Page 29

1   marked it without going back and looking at the print
2   that we had marked up.
3      Q.  Print who had marked up?
4      A.  Myself and Mr. Camby.
5      Q.  Who is in possession of that print now?
6      A.  I honestly don't know.  I don't know if Harvard
7   is or if it was in my package, so I would have gone with
8   this.  It was basically a set of prints that we had
9   put up on the wall and highlighted in different colors
10  as to what phase was going to be numbered what phase
11  so that myself and Mr. Camby were on the same page as
12  to where we were working, what was going on in those
13  areas.
14         I know someone had made reference to five
15  phases on this project.  I don't recall the exact
16  number, but I believe it was more than five.  Again, I
17  can't say for sure.
18     Q.  All right.  I'm going to read to you from —
19  well, I'll give it to you.
20         I hand you the daily project activity log
21  for the 14th that was prepared I guess by Harvard
22  Environmental.  Could you read through that and tell
23  me if that refreshes your recollection at all?
24     A.  (Reviewing document)  It references the phases,

8 (Pages 26 to 29)

Page 30

1  but it doesn't reference what phase each was in
2  reference to what we had marked on the print. So it's
3  hard for me to recall at this time which phase started
4  and ended where and where each phase began and ended
5  where.
6        Again, the maps were marked. The cutoff
7  points on the maps had no distinction other than where
8  we had decided in the field at the time to make phase
9  1 go from and to and phase 2 go from what start point
10  to what endpoint. And that's what we based it on.
11        So in order for me to tell you what phase
12  was what, I would have to see the map, the maps, the
13  highlighted maps that we had with our writing on them
14  to reference what phase was what.
15  Q. Is there any paperwork from Plymouth that would
16  tell me when that second trailer was delivered?
17  A. I don't recall whether we got a delivery slip
18  or not, but there's a manifest on every trailer as to
19  when it gets pulled when it goes to the landfill.
20  Q. When it gets taken off the job?
21  A. Correct.
22  Q. So I can tell theoretically when it went off
23  the job, not necessarily when it got there?
24  A. You can absolutely tell when it went to the

Page 31

1  landfill. I can't guarantee that you're going to be
2  able to find out when it arrived on site. I don't
3  have that information.
4  Q. You don't have it, but does anyone at Plymouth
5  have it?
6  A. I don't know.
7  Q. So you don't know whether there's a job order
8  for Joe Smith to take the trailer over to Banneker
9  Elementary School?
10  A. I'm sure someone either from my office or
11  myself called to order the trailer. They should have
12  a record of -- the hauler should have a definite date
13  and record of when it was delivered.
14  Q. If I wanted to ask for records for this
15  particular trailer, what would I refer to the trailer
16  as? Is it a particular type of trailer?
17  A. It's a friable asbestos dumpster.
18  Q. Friable?
19  A. Friable.
20  Q. You say it's a dumper. That means it's a dump
21  trailer?
22  A. It's probably a 50-foot trailer that has to be
23  handloaded and handunloaded.
24  Q. The lower floor that you were talking about

Page 32

1  that you didn't think you could get out the door to
2  the parking area where this trailer was -- you're
3  looking at me like that's not what you said before, so
4  let me rephrase that.
5  A. It's not what I said before.
6  Q. It's my understanding that the door leading to
7  the lower parking lot where this second trailer was
8  parked somehow you didn't have access to. Is that
9  incorrect?
10  A. I can't recall exactly, but I believe at the
11  time the phasing, again, the phasing on the floor
12  above that had the only access through a stairwell to
13  the lower floor was under containment. I believe it
14  was under containment or it was in the process of
15  being cleared.
16  Q. Okay. So the access problem was on the first
17  floor, not the second floor?
18  A. There are only two accesses to that lower
19  floor. One was a stairwell which went down through
20  the upper floor of the building and the other was a
21  doorway that was down in the lower parking lot.
22  Q. On Defendant's 2 where was the access from the
23  first floor to the second floor?
24  A. Again, I'm assuming, because I don't know if

Page 33

1  this is the correct stairwell or not, but that's the
2  only stairwell that shows on this print. Is there
3  another print? Again, your client earlier said that
4  this building has been added onto several times.
5  Okay? This print does not show that lower floor.
6  Q. All right. This print is the Harvard
7  Environmental print.
8  A. If I had to guess, if I had to guess, and again
9  I'm guessing, because this is the only stairwell in
10  this vicinity I would have to say it was that
11  stairwell (indicating).
12  Q. Based on what you see here you think it's this
13  (indicating) stairwell because that's somewhat in the
14  area where the lower parking lot was?
15  A. The portion of the lower part of the building
16  the best that I can recall is in this (indicating)
17  area. Exactly where, I don't know.
18  Q. All right. So can you draw just kind of a
19  circle -- I'm not asking you to do it to scale --
20  somewhere where you think that's the stairway?
21  A. That's the only stairwell that's feasible on
22  the print.
23  Q. Okay.
24        MR. DOERLER: Can I take five minutes? I

9 (Pages 30 to 33)

Case 1:05-cv-00163-GMS   Document 38-7   Filed 05/26/2006   Page 11 of 24

Mahoney                                                    v. Benjamin Banneker Elementary School and Milford School District
James G. Mahoney, Sr.                      C.A. # 05-163 GMS                                    February 13, 2006

Page 34

1  want to see if I can go find a different set of
2  documents.
3         MR. SNYDER:  Sure.
4         (A brief recess was taken.)
5         MR. DOERLER:  Can I have that marked?
6         (Defendant's Deposition Exhibit No. 3 was
7  marked for identification.)
8  BY MR. DOERLER:
9     Q.  I've just handed you a document which you have
10  had marked as Defendant's 3.  Is that the layout for
11  the lower level work that you were talking about?
12     A.  Again, how do I answer this question?  Based on
13  this print, I honestly can't answer that question.
14         Does it look like it represents it?  Yes.
15         Again, for me to try to reference this
16  from this (indicating) is hard.
17     Q.  All right.  Well, you indicated that there's a
18  first floor remediation and a lower level remediation,
19  correct?
20     A.  Yes.
21     Q.  Is that the only levels?
22     A.  Yes.
23     Q.  All right.  Could you just assume for me that
24  that was the lower level work layout?

Page 35

1     A.  Yes.
2     Q.  Can you draw for me on there where this parking
3  lot was that you were talking about, where the trailer
4  was?
5     A.  I'm not certain.  And the reason, the reason I
6  say I'm not certain is I don't know how this is laid
7  out in reference to the rest of this (indicating).  So
8  I can't --
9     Q.  Let's assume this (indicating) is the same
10  stairway that you just circled.
11     A.  Right.
12     Q.  Where would the parking lot be?
13     A.  I know it wasn't right off the stairwell, but I
14  honestly can't say where it was located, on which side
15  of the building based on these.  I would be guessing.
16     Q.  What do you need?  You need some type of a
17  layout, some type of a larger plan?
18     A.  I don't -- I'm assuming the school should have
19  some kind of a print that shows the upper and the
20  lower parking lots.  I can't remember from three years
21  ago how this was, where this parking lot was set.
22         When you walked through the building when
23  you went down these stairs and stuff, you're turning
24  in different directions.  I don't recall exactly which

Page 36

1  side -- if you look at this, there's only one set of
2  doors by the stairwell and I don't recall which
3  exterior door we had been coming out to access the
4  parking lot.
5     Q.  All right.  Can you hand draw me, on that
6  yellow piece of paper can you hand draw what you're
7  talking about?
8     A.  I'll guess.  I mean, based on where the stairs
9  were --
10     Q.  On Marinucci 1?
11     A.  Right.  Based on where the stairs were, I'm
12  guessing that the lower parking lot was right at the
13  bottom of these (indicating) steps.  And I don't
14  recall whether it turned this way.  I don't even
15  recall how it was shaped.  All I know is there was a
16  doorway back here that we had used to access this
17  lower level and we had a trailer that was set
18  somewhere in this vicinity of the parking lot for us
19  to take our waste out of this lower level of the
20  building.
21     Q.  All right.  Can you write the word "trailer" in
22  on that?
23     A.  (Witness complies).
24     Q.  Can you draw in for me where the stairs are in

Page 37

1  your drawing where your wife fell down?
2     A.  I'm guessing.
3     Q.  Obviously it's not to scale.
4     A.  I mean, this may have been square or rectangle.
5  I don't even recall.  All I know is there were
6  stairs -- these stairs went from this upper parking
7  lot to a lower parking lot.
8         MR. SNYDER:  You're referring to the
9  stairs on the first floor on Marinucci 1.
10     A.  The one from the upper parking lot by the
11  loading dock.
12     Q.  And this trailer you just drew for me is in the
13  lower parking lot?
14     A.  Correct.
15     Q.  Somewhere to the left of the stairs?
16     A.  Yes, to the left end of the parking lot
17  somewhere.
18     Q.  And the lower parking lot had access to a lower
19  level of the building?
20     A.  Correct.  But there was no, there was no per se
21  entranceway that was keyed that we could access.  We
22  had access -- there was only one key that was given to
23  either myself or Harvard and it was issued to
24  Harvard's representative to open this front door.

Case 1:05-cv-00163-GMS    Document 38-7    Filed 05/26/2006    Page 12 of 24

Mahoney                                    v. Benjamin Banneker Elementary School and Milford School District
James G. Mahoney, Sr.              C.A. # 05-163 GMS                    February 13, 2006

Page 38

1    If we needed to use another door somewhere
2  based on what our phasing was, we would open the door
3  from the inside and make sure it was locked from the
4  inside. Harvard is the one who basically had control
5  of securing the building. They had the key to access
6  the building.
7    Q.  In the morning and locked it up at night?
8    A.  Well, I mean...
9    Q.  Okay. But the problem with access to the
10 trailer on the day in question though was that there
11 was some containment problem?
12   A.  I believe, I believe the day the trailer was
13 delivered -- and, again, I'm recalling this. I know
14 that the incident occurred the day or the day after
15 the trailer was delivered. Okay?
16    What happened was for some reason there
17 was no access through the stairwell to get down to the
18 lower parking lot. That's the only reason these
19 stairs were used. They had to get down to that lower
20 parking lot to line that trailer.
21    MR. DOERLER: Can I have this marked?
22    (Defendant's Deposition Exhibit No. 4 was
23 marked for identification.)
24

Page 39

1  BY MR. DOERLER:
2    Q.  Let's assume that you're using the office
3  location in Marinucci 1 and it's up ten steps that you
4  had to get your equipment up into the building and you
5  have to remove a railing or something to get your
6  equipment up there.
7      Would that be something that you would all
8  do yourselves or would you turn to the owner of the
9  property or Harvard and say I need these railings
10 removed?
11   A.  That would depend.
12   Q.  What would it depend on?
13   A.  I would, first of all, never just remove the
14 railings of my own accord. I'm the school
15 district's representative. Anything that I did on
16 this site I had to go through Harvard to do and he, in
17 turn, was supposed to go to his client.
18   Q.  Is it your understanding that Harvard was
19 supposed to do some type of an inspection outside of
20 this building for safety hazards?
21   A.  I don't know what his contract with his client
22 was.
23   Q.  Is that something that you expected him to do
24 as the person in charge of this site?

Page 40

1    MR. SNYDER: Objection to the question.
2      You can answer, if you know.
3    A.  I don't know what his responsibilities were.
4    Q.  What did you think that they were?
5    A.  I know what his responsibility is as per the
6  state law and that's to oversee everything that I'm
7  doing and make sure that it's being done in accordance
8  with all state regs., all of the federal regs. and in
9  a safe manner and in the client's best interest.
10   Q.  And when you say everything you're doing,
11 you're referring to the specific abatement?
12   A.  All work, all work that I'm doing in that
13 building in accordance with my scope of work, he's
14 there to oversee.
15    MR. SNYDER: Just for the record, "he"
16 being Dwayne Camby?
17    THE WITNESS: If that's who their
18 representative on site was.
19    MR. SNYDER: Okay.
20 BY MR. DOERLER:
21   Q.  And if you needed a ramp or something built to
22 get your equipment up some stairs, would you build
23 that or would you ask Harvard for a ramp?
24   A.  It would depend, again, on what was expected of

Page 41

1  me. If I had to get my equipment into the building
2  and I needed to build a ramp and that was the only way
3  I could get it in and my boss knew that prior to, then
4  I would build a ramp.
5    Q.  If you were working on stairways in a building
6  to be demolished that there were no railings on, what
7  would you tell your workers?
8    A.  What do you mean what would I tell my workers?
9    MR. SNYDER: Objection to the form.
10   Q.  Would you tell your workers not to use the
11 stairway? Let me rephrase this question.
12    If you come across in a building being
13 demolished you come across stairways that your workers
14 have to use and there's no railings going up the
15 stairs, what would you do to protect your workers?
16   A.  If it's an unsafe condition my people don't go
17 in there.
18   Q.  And you would consider not having railings on
19 stairways?
20   A.  It's something that would be discussed with my
21 boss. If I walked into a building and the stairwell
22 didn't have any railings and it's 30 feet high and I'm
23 expecting my people to remove pipe insulation that's
24 another ten foot high with no railing, I call my boss

Mahoney                                        v. Benjamin Banneker Elementary School and Milford School District
James G. Mahoney, Sr.                    C.A. # 05-163 GMS                              February 13, 2006

Page 42

1  and say, "These are the problems we have. How do you
2  want to address it?"
3     Q.  Would you expect your company to make some
4  adjustments or would you expect the owner --
5     A.  That's between him and the owner as to what the
6  conditions were. What you have to understand is a lot
7  of times these buildings are looked at and bid on
8  years, a year or two in advance. The conditions that
9  exist when they're looked at and the conditions that
10  exist when we arrive on site are totally different at
11  times.
12        So it's going to depend on how this was
13  looked upon and that's something for my boss and the
14  owner to work out based on what the conditions are now
15  as opposed to what they were when it was bid on.
16     Q.  All right. You were here for Mr. Marinucci's
17  deposition, correct?
18     A.  Yes, I was.
19     Q.  And there were some questions about if a tree
20  fell across a stairway that you needed access to to
21  get into the building. In that situation who would
22  you expect to have removed the tree?
23     A.  It's not my responsibility.
24     Q.  Is that something that you would call your boss

Page 43

1  and say, "There's a tree in my way"?
2     A.  If they didn't want to give us access,
3  basically what I would do is call the owner of the
4  company, my boss, and say, "We can't get into the
5  building because a tree fell across the doorway. So
6  if they're not going to fix it, the only alternative
7  is for us to go home."
8        It's not my responsibility to -- see, in
9  my opinion what my responsibility is as far as this
10  project was concerned was what my scope of work was
11  inside this building.
12     Q.  All right. And what is the basis for that?
13     A.  What's the basis for that?
14     Q.  Yes.
15     A.  It's been that way for as long as I have been
16  in this business. If my boss bids on me removing tile
17  in all these rooms and a tree falls in the parking
18  lot, that parking lot is not my responsibility.
19     Q.  What if a tree --
20     A.  That's the building owner's responsibility.
21     Q.  What if the tree falls across the stairs that
22  you're using to get into the building, you still think
23  that's the owner's responsibility?
24     A.  It's not mine. My contract as far as I'm

Page 44

1  concerned as a supervisor on the site, my
2  responsibility is to make sure my people are safe, to
3  do the job in accordance with all state and federal
4  regs. and to go to the consultant if there's an issue
5  with that. Okay?
6        If that tree fell across that doorway and
7  I couldn't get into the building, my immediate
8  response would be go to Mr. Camby and say, "How do we
9  address this?" And it's up to him to go to his client
10  and that's where it goes from there.
11     Q.  So you're not sure in this scenario whether
12  Mr. Camby would call your boss or whether he would
13  call the owner, correct?
14     A.  He would call his boss and in turn the owner.
15     Q.  And it's your belief that one or the other of
16  them would take this away and not Plymouth?
17     A.  I believe so.
18     Q.  The stairway that your wife fell down, how
19  often did you use that stairwell during the project?
20     A.  I didn't.
21     Q.  How often did your company use the stairwell?
22     A.  We didn't.
23     Q.  That was the first time you went down the
24  stairway?

Page 45

1     A.  Yes, it was. And it was also the last. To the
2  best of my knowledge, it was the first and last time
3  it was used.
4        MR. DOERLER:  I have to make copies of
5  this. I'll be right back.
6        (A brief recess was taken.)
7  BY MR. DOERLER:
8     Q.  You testified I believe that that was the first
9  time you had used those stairs. When you first came
10  onto the project did you anticipate needing to use
11  those stairs for any reason?
12     A.  In the beginning? No. Not that I recall.
13     Q.  I'm going to hand you what I believe was
14  Exhibit B to the complaint and ask you to please tell
15  me what that is.
16     A.  It's an accident report.
17     Q.  Okay. Is that the accident report that you
18  filled out related to your wife's falling on July
19  15th?
20     A.  Yes.
21        MR. DOERLER:  Can we have that marked?
22        (Defendant's Deposition Exhibit No. 5 was
23  marked for identification.)
24

12 (Pages 42 to 45)

Case 1:05-cv-00163-GMS    Document 38-7    Filed 05/26/2006    Page 14 of 24

Mahoney                                    v. Benjamin Banneker Elementary School and Milford School District
James G. Mahoney, Sr.              C.A. # 05-163 GMS                February 13, 2006

Page 46

1  BY MR. DOERLER:
2  Q.  Under description of accident — let me just
3  confirm.  Is this entire form filled out in your
4  handwriting?
5  A.  Yes, it is.
6  Q.  Under description of accident it says, "Walking
7  down exterior steps and tripped on loose stone."
8      So it's my understanding that she was
9  walking down the steps and not up the steps, correct?
10  A.  That's my understanding also.
11  Q.  And you say she tripped on loose stone.  What
12  do you mean by that?  Did she slip or did she stub her
13  toe?
14  A.  Again, I was not there when this accident
15  occurred.
16  Q.  I'm just trying to find out what is your
17  understanding based upon what's here.
18  A.  My understanding after speaking to her and the
19  person who was with her was as she was walking down
20  the steps the concrete beneath her feet basically
21  crumbled and she slipped.
22      Now, can I say for sure that's what
23  happened?  No.
24  Q.  I'm just asking you what you meant by what you

Page 47

1  wrote here.
2  A.  I just basically — again, when I wrote this
3  out I wrote down the basis of what happened when I
4  sent her to the hospital.
5  Q.  This is based upon speaking with your wife and
6  to Mr. Lawson?
7  A.  Yes.
8  Q.  It says, "Corrective action to prevent further
9  injury" and it says, "Closed steps."  What does that
10  mean?
11  A.  I put barricade tape across the bottom and top
12  of the steps.
13      Was it my responsibility?  No.
14  Q.  Was there anything preventing you from putting
15  barricade tape up before she fell?
16  A.  It wasn't in my scope of work and it wasn't an
17  area deemed that we were going to need to work in.
18  Q.  All right.  So —
19  A.  Let me clarify that for you.  I didn't know
20  there was an issue with these steps until this
21  incident occurred.
22  Q.  And one of the reasons, if I'm correct, is that
23  you didn't anticipate having to use those steps,
24  correct?

Page 48

1  A.  Correct.
2  Q.  If you didn't anticipate using those steps, was
3  there any reason to believe that Harvard would have
4  anticipated you having to use those steps?
5  A.  I can't speak for Harvard.  Again, I don't know
6  what their responsibility on that job was to their
7  client.
8  Q.  If you had anticipated having to use those
9  steps or your employees using them, is that something
10  that you would have inspected?
11  A.  When I walk into a building I walk through the
12  building and I go through with the consultant.  In a
13  situation like this I look for anything that can be a
14  hazard and it's marked.  I do job box meetings with my
15  personnel in any area that I'm going to need to work
16  in based on what my scope of work is.
17  Q.  If these steps where your wife had fallen —
18  A.  These steps were in —
19  Q.  Let me ask my question.
20      MR. DOERLER:  Let him finish the question.
21  Q.  If these steps were the steps that you were
22  designated to use in and out, let's say they made you
23  park in this lower parking lot and walk up these steps
24  and go in the building that way, would you look for

Page 49

1  tripping hazards on the stairs in that instance?
2  A.  Yes, I would.  And if it was unsafe, we would
3  look for another route by going to the consultant or
4  the client.
5  Q.  In that instance you wouldn't use those stairs?
6  A.  Correct.
7  Q.  The health and safety program that's put out by
8  Plymouth Environmental, is that limited to asbestos
9  abatement containment projects on the interior of the
10  building?
11  A.  It depends on our scope of work.
12  Q.  So if there's asbestos removal occurring on the
13  outside of the building, it would also apply there?
14  A.  If I was doing a roof.  It would apply within
15  the realm of whatever my scope of work is.
16  Q.  At the time of this accident the book indicates
17  that Andrew Lunnutti was in charge of the employer's
18  or Plymouth's health and safety program.
19      Do you agree with that?
20  A.  Do I agree with that?
21  Q.  Yes.
22      Is it your understanding that he was in
23  charge of the health and safety program for Plymouth
24  Environmental in July 2003?

13 (Pages 46 to 49)

Page 50

1    A. I believe so, yes.
2    Q. Do you know if he's the one that drafted this
3  health and safety plan?
4    A. I do not.
5    Q. How often was Mr. Lunnutti on the site?
6    A. I don't recall.
7    Q. Do you recall him being there at all?
8    A. Yes.
9    Q. Do you recall whether it was more than once a
10  week?
11    A. No.
12    Q. You don't recall or no, he wasn't?
13    A. It wasn't once a week.
14    Q. All right. Are you saying that it was less
15  frequently than once a week?
16    A. Yes.
17    Q. Was it more frequently than once a month?
18    A. I don't recall.
19    Q. It indicates in the health and safety book for
20  Plymouth that Mr. Lunnutti would investigate accidents
21  and prepare personal injury reports.
22        Do you know if he did that in this case?
23    A. I don't know.
24    Q. Who would have those records at Plymouth

Page 51

1  Environmental if he did prepare a report? Do you
2  know?
3    A. Usually who handles our records is Georgann.
4    Q. Does Georgann have a last name?
5    A. I don't know her last name.
6    Q. Was she there in July of 2003?
7    A. Yes.
8    Q. Do you recall whether Mr. Lunnutti had an
9  on-site safety meeting with you at this project prior
10  to it starting?
11    A. I don't recall.
12    Q. Do you have on-site safety meetings prior to
13  starting jobs typically?
14    A. I do gang box meetings with my personnel, yes.
15    Q. Do you have a meeting with Mr. Lunnutti?
16    A. Do I?
17    Q. Yes.
18    A. No.
19    Q. Let's go back to these documents.
20        The first document that I'm asking you to
21  look at is MSD 0006, which is a daily log and safety
22  report.
23        Is that completed in your handwriting?
24    A. Yes.

Page 52

1    Q. This report is dated June 30th of 2003. And
2  under safety meetings it says review work area hazards
3  and there's a check mark.
4    A. Yes.
5    Q. So there's actually four check marks on this
6  page by the safety meeting category. Can you explain
7  what those check marks mean?
8    A. Basically that I went over with whoever was on
9  site what the day's activities would be and what, you
10  know, where our meeting point would be in case of a
11  fire or whatever the case may be.
12    Q. When you reviewed it, when you reviewed work
13  area hazards, what types of hazards are you referring
14  to? Fire hazards?
15    A. Fire hazards, anything that could occur in each
16  work area, anything that I could foresee.
17    Q. So the work area here, is that a limited space
18  at this point? It's not the whole project?
19    A. It just depends on each project. It differs.
20    Q. So the first day of the project would it cover
21  the whole site?
22    A. No.
23    Q. Would it include what you're working on on that
24  particular day?

Page 53

1    A. It could be that day. It could be that week.
2  It could be the first two weeks depending on when we
3  were moving or what we were doing that particular, at
4  that particular time or how the phasing was laid out.
5    Q. It says review and inspect PPE. What does that
6  mean?
7    A. Personal protective equipment.
8    Q. Then the last one that's checked off is
9  specific job hazards. Do you recall what the specific
10  job hazards would have been in this case?
11    A. It depends on building to building. Whatever
12  myself and the consultant see on the walk-through that
13  could be potentially a hazard.
14    Q. The next day, 7-1, under safety meeting there's
15  nothing checked off. Does that mean you didn't have a
16  safety meeting that day?
17    A. I don't recall.
18    Q. I'm looking at the document that's MSD 0008.
19  Is it your standard practice to put a check mark in
20  the spot if you actually have the safety meeting?
21    A. I'm not infallible. I don't always do it. It
22  doesn't mean that I didn't have it.
23    Q. Are these daily log reports that we're looking
24  at, are they in your handwriting?

14 (Pages 50 to 53)

Page 54

1    A. Some are. Some aren't.
2    Q. All right. June 30th, is that your
3    handwriting?
4    A. Yes.
5    Q. And 7-1, is that your handwriting?
6    A. No, it's not.
7    Q. Whose handwriting is that?
8    A. It's my wife's.
9    Q. Was she a supervisor on the site?
10   A. No.
11   Q. What was her function on the site?
12   A. It just depended. Sometimes she did my
13   paperwork. Sometimes she would write a daily log,
14   depending on what I was incurring that day.
15   Q. What was her title?
16   A. What was her title?
17   Q. Yes.
18   A. She's a laborer.
19   Q. A laborer. Okay. So this is one of the jobs
20   that you assigned her was to fill out this daily log?
21   A. If I was busy. On that particular day if you
22   look at the day, I was walking around with Mr. Sells
23   from facilities management, which is a state
24   inspector.

Page 55

1    Q. And the day you were talking about was July
2    1st?
3    A. Correct.
4    Q. On July 15th, it's Bates stamped MSD 0024, that
5    report is filled out in your handwriting?
6    A. Yes, it is.
7    Q. And then at the bottom of this form it says at
8    8:15 Tina Mahoney slipped on a rock going from
9    exterior steps or going down exterior steps and
10   scraped both knees, elbows, treated with first aid for
11   scrapes and sent to hospital for X-rays of swollen
12   right knee.
13       What does that say? Allen Lawson is what?
14   Taking Mahoney off site to hospital?
15   A. It says Allen Lawson is supposed to take Tina
16   Lawson off site to hospital.
17   Q. Both of them off site to hospital, okay.
18       Here I'm just curious. It says she
19   slipped on a rock and before you said it was your
20   understanding that some concrete fell away. Do you
21   have any recollection which it is at this time?
22   A. It's basically because the concrete on the step
23   was crumbling.
24   Q. All right. I'm just trying to figure this out.

Page 56

1    Before I believe you testified it was crumbling
2    concrete and now this refers to a rock.
3        Do you have a specific recollection of --
4    A. It wasn't rook. She slipped on loose concrete
5    on the step is what it was. How I worded this, again
6    I have other responsibilities to deal with at the
7    time. I more than likely didn't word everything the
8    way I should have when I was writing it down.
9    Q. Okay. So as you sit here today, it's your
10   understanding that she slipped on concrete that became
11   loose?
12   A. Correct.
13   Q. When she came back from the hospital did she
14   work the rest of the day?
15   A. She remained on site. She had a cast on
16   pending seeing another doctor. From what I believe,
17   they told her at the hospital that she had a cracked
18   kneecap and had to follow up with an orthopedic
19   doctor.
20   Q. So she came back to the site that day, right?
21   A. Yes, she did.
22   Q. Did she actually work?
23   A. She sat in the office.
24   Q. I see that she came in the next day. Was she

Page 57

1    working on that day?
2    A. She basically sat in the office.
3    Q. So although she's on these sheets, she
4    didn't -- let me ask the question.
5        Although she's on these sheets, she wasn't
6    actually doing any work?
7    A. Correct.
8    Q. And Plymouth continued to pay her for that
9    time?
10   A. Yes, they did.
11   Q. Was she doing paperwork?
12   A. It depended. I don't recall exactly what she
13   did each day.
14   Q. Prior to the fall on July 15th can you give me
15   a general description of the types of duties that your
16   wife was doing on the job site?
17   A. A general description?
18   Q. Yes.
19   A. It varied. Basically, what it came down to was
20   sometimes she would do my paperwork. If I needed her
21   to hang poly, she would hang poly. If I needed her to
22   take up floor tile, she would take up floor tile.
23       It just depended on what the job entailed.
24   Q. So one of the jobs she might have done is take

15 (Pages 54 to 57)

Page 58

1  up floor tile. Another is hang poly you said?

2  A.  Correct.

3  Q.  What other types of jobs does a laborer do?

4  A.  Remove pipe insulation. There's a million

5  different jobs a laborer does.

6  Q.  It's my understanding that this job was done in

7  phases, correct?

8  A.  Correct.

9  Q.  Now, did you have the laborers set up by any

10 kind of a specialty? These laborers did floor

11 removal? These laborers hung poly?

12 A.  It basically depended on what they were good at

13 and what they weren't good at based on what they did.

14 Some guys are better at hanging poly than they are

15 removing floor tile. It just depends on what we're

16 doing at any given time.

17 Q.  Was there any particular jobs that your wife

18 was better at that you would have assigned her to more

19 often?

20 A.  No. She was fairly experienced in this field.

21 She's been doing it for almost as long as me.

22 Q.  Does asbestos abatement removal require any

23 type of heavy lifting?

24 A.  At different times, yeah.

Page 59

1  Q.  And when you say heavy lifting, if you said

2  heavy lifting, what does that mean to you? 50 pounds?

3  Less than 50 pounds?

4  A.  It depends on the person you ask. Doesn't it?

5  I don't know. What's heavy for me may not be heavy

6  for somebody else. I don't know.

7  Q.  If somebody had to lift 50 pounds would that

8  been an unusual job if they had to pick up --

9  A.  It depends on the project.

10 Q.  What types of projects would require lifting 50

11 pounds or more?

12 A.  We do boiler demos that are covered with

13 asbestos. We do -- there are numerous different

14 projects that that entails.

15 Q.  Are those types of assignments the kind that

16 you would typically give your wife?

17 A.  It would depend.

18 Q.  What would it depend on?

19 A.  On who was on site, who was better at it than

20 others. It's a judgment call.

21 Q.  Was your wife always assigned to the same jobs

22 that you were working on?

23 A.  Was she always? No. She's been on projects

24 with other supervisors.

Page 60

1  Q.  Can you give me a percentage of time that she

2  works on projects that you're working on?

3  A.  I don't know. It just depends.

4  Q.  Is it greater than 50 percent?

5  A.  Since when? Since she started with this

6  company or in her career? Because she wasn't always

7  with this company.

8  Q.  Let's say in this company.

9  A.  She started with me. The way we work

10 usually -- and every crew in this company is the same

11 way. Each of them have their own core group of guys

12 and that's who works with them.

13 Q.  So in this company your wife is one of your

14 core group of people and she travels from site to site

15 with you?

16 A.  Yes.

17 Q.  And did she work with you at a different

18 company prior to this?

19 A.  Yes.

20 Q.  Which one?

21 A.  RMI.

22 Q.  Which one?

23 A.  RMI, Resource Management Incorporated.

24 Q.  Are there any papers from Plymouth indicating

Page 61

1  what a particular person is doing on a particular day?

2  Like would you say this worker X prepped phase 3,

3  worker Y demolished phase 4?

4  A.  These daily logs are basically an overview of

5  what took place on each given day.

6  Q.  And this is it then (indicating)?

7  A.  Yep. And that's a general industry standard.

8  Q.  By looking through these reports if I gave you,

9  say, reports for the two or three days before the 15th

10 when she fell, would you be able to tell me what type

11 of jobs she was doing by looking at these reports?

12 A.  I may. I may not. I don't know. It just

13 depends.

14 Q.  It depends on what you wrote on the form?

15 A.  No. It depends on -- again, you can look at

16 these forms. There are times I had anywhere from two

17 to twelve people on site.

18      Do I know where any one of them were at

19 every given minute or what they were doing at every

20 given minute? No, I don't.

21 Q.  Is Dwayne Combs still with Plymouth

22 Environmental?

23 A.  Yes, he is.

24 Q.  Is he one of your regular crew?

16 (Pages 58 to 61)

Page 62

1   A.  Yes, he is.

2   Q.  The same with James Doerr?

3   A.  Yes, he is.

4   Q.  Since the accident what type of restrictions or

5   what type of activities at work is your wife not able

6   to do that she was able to do before?

7   A.  There's a lot of things that she can't do now.

8        MR. SNYDER:  You mean today at present?

9        MR. DOERLER:  Yes.

10       MR. SNYDER:  Okay.

11  A.  There's a lot of things she can't do that she

12  used to do.

13  Q.  Can you give me some examples, please?

14  A.  She can't be on her knees for any length of

15  time to tape in poly.  When we're hanging poly on the

16  walls you have to tape the bottom of the walls.

17  Anything that requires her to squat for any extended

18  period or a whole lot of walking.  It's a nightmare.

19  It's been a nightmare.

20  Q.  All right.  Well, I'm trying to get specific.

21  So she's having difficulty being on her knees.  She's

22  having difficulty with squatting.

23       Other than taping the bottom of poly, what

24  types of jobs require squatting?

Page 63

1   A.  Pretty much all of them when you get to the

2   cleanup portion of the job.  The prep portion of the

3   job, the cleanup portion of the job, removing floor

4   tile, you're constantly bent over or you're constantly

5   needing to get down on your knees to clean the floors.

6        And, again, I'm basing it on what I see as

7   far as production and performance on her part.

8   Q.  So squatting when she's prepping, when there's

9   prepping and cleaning floors, correct?

10  A.  (The witness nodded.)

11  Q.  Walking?

12  A.  Going up and down ladders.  There's a lot that

13  she's been affected by it.

14  Q.  All right.  Can you think of any more than the

15  examples you have given me?

16  A.  No.  Right now I'm just looking at it like it's

17  affected her performance at work a lot, in a lot

18  different manners based on the fact that this is a

19  physical field.

20  Q.  So she has difficulty being on her knees,

21  squatting, walking and going up and down ladders.

22       Anything else that comes to mind right

23  now?

24  A.  For me, no.  That's something that you will

Page 64

1   have to ask her.

2   Q.  And has her pay been affected by these

3   limitations?

4   A.  Her rate of pay?

5   Q.  Yes.

6   A.  No.

7   Q.  In one of the interrogatory responses there's

8   an indication that you spoke with several people,

9   including people at Milford School District, about how

10  the accident occurred.

11       Do you recall who you spoke with?

12  A.  The main one I spoke to was, the main two

13  people who I spoke to that day were Robert Sells from

14  facilities management and Dwayne Camby from Harvard

15  Environmental.

16  Q.  We already figured this out.  But Sells is

17  S-e-l-l-s?

18  A.  Yes.

19  Q.  And he's with the state, correct?

20  A.  Facilities management, I believe.

21  Q.  He's not with the school district?

22  A.  Correct.

23  Q.  And Mr. Sells was on site the day of the

24  accident?

Page 65

1   A.  He wasn't there when the accident occurred, but

2   he did come over there to check on things.

3   Q.  Later that day?

4   A.  Yes.  I believe so.  I believe it was later

5   that day.  It was either later that day or the

6   following day.  I don't recall exactly, but I'm pretty

7   sure it was later that day.

8   Q.  If he was on site, would you have made a

9   notation of that on your daily log?

10  A.  I may have.  It just depends on what I was

11  doing at the time.  Normally I do.  But if I didn't --

12  Q.  It says, on the 16th it says, "B. Sells on site

13  to check progress."

14       So is that what you're referring to?  Is

15  that when you would have spoken to him?

16  A.  It's very possible.  I do recall him finding

17  out about the accident and coming over and checking my

18  paperwork to make sure that -- first of all, any time

19  something like that happens he will go to sites to see

20  what happened and what went on and make sure that

21  everything was done in accordance with the law.

22  Q.  So he investigates accidents on asbestos

23  abatement sites?

24  A.  His job as facilities management is to check

17 (Pages 62 to 65)

Case 1:05-cv-00163-GMS    Document 38-7    Filed 05/26/2006    Page 19 of 24

Mahoney                                        v. Benjamin Banneker Elementary School and Milford School District
James G. Mahoney, Sr.           C.A. # 05-163 GMS                        February 13, 2006

Page 66

1  into what's going on with safety as far as the
2  abatement project is concerned for the state to make
3  sure that Mr. Camby was doing his job by watching my
4  company.
5     Q.  So with respect to people at Milford School
6  District itself, did you have any conversations with
7  anyone from the school district?
8     A.  I don't recall. I know I spoke to Dwayne about
9  it and usually it's Dwayne's responsibility to go to
10  the building owner, but I don't recall whether I had
11  any specific conversations with them or not.
12    Q.  Are you familiar with Mr. Lunnutti's signature?
13    A.  Not really, no.
14    Q.  So if I handed you a document and asked you to
15  confirm that it was his signature, you wouldn't be
16  able to do it?
17    A.  I doubt it.
18    Q.  Are you familiar with James Kelly's
19  signature?
20    A.  I see it on my check all the time.
21    Q.  All right.
22        MR. DOERLER:  Let's have that marked.
23        (Defendant's Deposition Exhibit No. 6 was
24  marked for identification.)

Page 67

1  BY MR. DOERLER:
2     Q.  Can you look at the second page here which is
3  actually page 4? It's on the backside of the top
4  page.
5         Can you confirm for me -- you say you're
6  familiar with Mr. Kelly's signature from signing your
7  checks. Can you confirm or not confirm whether that's
8  Mr. Kelly's signature?
9     A.  I don't know.
10    Q.  We talked a little bit about your wife's
11  limitations at work as they exist today. Can you tell
12  me are those limitations different than the
13  limitations she had shortly after the accident?
14    A.  The limitations today?
15    Q.  Right. We already discussed how she's doing
16  today.
17        Did she have the same limitations and
18  restrictions shortly after the accident?
19    A.  That's hard for me to make a decision on. She
20  went through I believe three surgeries, so she was
21  laid up a lot of the time. I can tell you she's been
22  in pain since this occurred.
23    Q.  Okay. All right. So she fell and then she had
24  the fractured kneecap, correct?

Page 68

1     A.  Correct.
2     Q.  And what did you observe about the type of pain
3  she was in at that time until the fracture healed?
4     A.  The fracture did -- how can I put this? She
5  was in a lot of pain with the kneecap. But as far as
6  I know before the fracture healed and if I recall
7  correctly -- I may be wrong -- but she was sent home
8  with an air cast on and told to see another doctor
9  pending on having an MRI done because all they could
10  do at the hospital was the X-rays.
11    Q.  Can you just describe for me what type of pain
12  she was in at that time when they sent her home from
13  the hospital?
14    A.  She was in a lot of pain.
15    Q.  I understand she commented to you about that at
16  that point?
17    A.  Yes.
18    Q.  What types of things was she having difficulty
19  doing at that point?
20    A.  When she came back from the hospital?
21    Q.  Right.
22    A.  She couldn't walk. She was on crutches. She
23  had an air cast on.
24    Q.  How long was she on crutches?

Page 69

1     A.  I don't even recall. I don't know the exact
2  amount of time.
3     Q.  During the time that your wife was recovering
4  what types of things was she unable to do around the
5  house?
6     A.  Pretty much she wasn't able to do a whole lot.
7     Q.  So what types of things did she normally do
8  that you had to start doing?
9     A.  Cook, clean, take care of the kids.
10    Q.  Okay. How long did you have to actually do
11  those things?
12    A.  I don't know. I still help her at this point.
13    Q.  Well, we need to at this point try to narrow
14  some of this stuff down because there's a claim for
15  damages out here, so we need to figure out how long
16  you had to help, the type of things you had to help
17  her do and how this has affected her. We need to try
18  to narrow that down.
19        If you're not going to testify about that,
20  I can certainly ask her.
21    A.  You would probably be better off asking her.
22  She has a better memory for those things than I do. I
23  don't recall exactly how long each, you know, I did
24  these things. I don't recall.

Case 1:05-cv-00163-GMS    Document 38-7    Filed 05/26/2006    Page 20 of 24

Mahoney                                                    v. Benjamin Banneker Elementary School and Milford School District
James G. Mahoney, Sr.              C.A. # 05-163 GMS                                    February 13, 2006

Page 70

1   Q.  You would defer to your wife on these issues?
2   A.  Yes.
3       MR. SNYDER:  You may want to rephrase the
4   questions. I'm not sure that he can answer, but
5   before surgery one, after surgery one, before surgery
6   two, after surgery two. I'm assuming that there was
7   different levels of requirements for assistance before
8   or after certain surgeries. I'm not sure.
9       MR. DOERLER:  I would agree with you. All
10  right. Let me see if I can get it rephrased and see
11  if that helps.
12      THE WITNESS:  I think these are better
13  questions left for her to answer. I mean, again, I
14  have eight billion things running through my head and
15  during the course of all of this time we were pretty,
16  I pretty much was stressed out because I still had to
17  continue doing my job.
18      So it's kind of hard for me to remember
19  exactly how long each one of these things took. We're
20  going back quite a bit of time too.
21  BY MR. DOERLER:
22  Q.  So am I correct in saying -- It's my
23  understanding she was on crutches for approximately
24  six weeks. Is that consistent with your recollection?

Page 71

1   A.  I guess so.
2   Q.  Would I be correct in saying that during that
3   period of time I had to do the cooking and the
4   cleaning and most of the household chores?
5   A.  Pretty much, yes.
6   Q.  Now, do you recall that situation improving at
7   all once she got off the crutches?
8   A.  Well, it didn't really improve because then she
9   had to go have an MRI done and then she got into the
10  surgery situations and she was laid up during those
11  periods.
12  Q.  So she had three surgeries, correct?
13  A.  Yes.
14  Q.  Do you recall how long she was off her feet
15  after each one?
16  A.  I can't recall.
17  Q.  Can you just generally describe for me how this
18  incident through today has impacted your wife and your
19  relationship with your wife?
20  A.  It's been a nightmare. I don't know how much
21  you want. We have both been under a lot of stress and
22  have gone through a whole lot. We have ended up
23  arguing a lot of times over a lot of different things.
24  Q.  It's my understanding that you're receiving

Page 72

1   marriage counseling. Is that correct?
2   A.  Yes, we are.
3   Q.  What's the name of your counselor?
4   A.  Frank Epifanio.
5   Q.  Can you spell his last name for me?
6   A.  I could try.
7   Q.  Okay.
8   A.  E-p-i I believe it's f-a-n-i-o.
9   Q.  E-p-i-f-a-n-i-o?
10  A.  I believe so. Don't quote me on that.
11  Q.  Where is Mr. Epifanio located?
12  A.  Route 73 in Berlin, New Jersey.
13  Q.  Now, is he a psychologist or a psychiatrist?
14  A.  Psychologist.
15  Q.  How long have you been seeing Mr. Epifanio?
16  A.  Probably the last year and a half to two years.
17  Q.  Have you received any marriage counseling prior
18  to July 15th of 2003?
19  A.  No.
20  Q.  How often do you see Mr. Epifanio?
21  A.  It varies. Sometimes every week. Sometimes
22  every other week.
23  Q.  Have you had any conversations with
24  Mr. Epifanio with respect to when the counseling might

Page 73

1   end?
2   A.  No, I didn't have any. I have had
3   conversations with him as to when the marriage may
4   end.
5   Q.  So do you believe that this counseling is
6   helping?
7   A.  Do I believe it helps? Yes.
8   Q.  Am I correct in saying that you continue to
9   plan on going to this counseling?
10  A.  Yes.
11  Q.  How did you get referred to doctor or to
12  Mr. Epifanio?
13  A.  I looked him up. I looked it up in the phone
14  book and he was close and I called him.
15  Q.  Have you ever received any other type of
16  psychological counseling?
17  A.  (Witness shakes head).
18  Q.  Has your wife received any other type of
19  psychological counseling?
20  A.  Not that I'm aware of.
21  Q.  All right. Other than what we have talked
22  about here today, is there anything else that you want
23  to tell me about how this accident has impacted your
24  relationship with your wife?

19 (Pages 70 to 73)

Page 74

1   A.  As far as what?
2   Q.  This is your opportunity to tell me any other
3   things you want me to know about how this has impacted
4   you and your wife.
5   A.  I think it's playing a large part in the fact
6   that we do not get along the way we used to get along.
7   That's a general overview.
8   Q.  By that you mean you're fighting more often?
9   A.  We're fighting more often.  She's in pain more
10  often.  We don't go and do any of the things that we
11  used to do.
12  Q.  What stuff are you not able to do anymore?
13  A.  We don't do the simplest of things as far as
14  even going to the movies.
15  Q.  Anything else?  Any other recreational
16  activities?
17  A.  We used to be very active.  We used to go
18  canoeing.  We used to go down the shore.  We used to
19  walk on the boardwalk.  There's a million things that
20  we used to do that we don't do anymore.
21  Q.  As far as you know, has a doctor restricted her
22  from doing activities like going to the movies?
23  A.  That's changed a million times from what I
24  understand.  Again, I'm only basing it on what I am

Page 75

1   told.  One minute she's told not to walk on the
2   treadmill.  The next minute she's told because she --
3   it's just changed a million times.
4   Q.  What doctor is changing these restrictions?
5   A.  That's something you will have to talk to her
6   about.  I don't know.
7        MR. DOERLER:  I think that's all of my
8   questions.
9   BY MR. SNYDER:
10  Q.  Jim, I'm going to ask you a couple of
11  questions.
12       How often do you recall did you see
13  Mr. Marinucci at the job site before Tina got hurt,
14  before the accident?
15  A.  Oh, I only remember him being there one time
16  before she got hurt.
17  Q.  How often do you remember seeing either
18  Mr. Reid or the maintenance staff at the job site
19  prior to the time of Tina's accident?
20  A.  A lot.  I recall them still moving things three
21  or four weeks into the job.
22  Q.  What kinds of things were they moving?
23  A.  Desks.  There was a lot of different stuff up
24  there.  They were even pulling some of the lockers out

Page 76

1   of the walls to move to different areas.
2   Q.  How close of a time frame prior to Tina's
3   accident did you see them moving these lockers?
4   A.  Up until the 15th?
5   Q.  Yes.
6   A.  I don't recall exactly how long they were -- I
7   know it was at least the first two or three weeks they
8   were still in the building because if you ever review
9   my logs on the 30th when we arrived on site nothing
10  had been moved.  So they were in the process of moving
11  things out of the building throughout the first three
12  or four weeks of the progress.
13  Q.  Did you ever see them outside maintaining the
14  grounds?
15  A.  Constantly cutting the grass.
16  Q.  Who would you see cutting the grass?
17  A.  The maintenance men from the school.  Sometimes
18  it was Mr. Reid.  Sometimes it was one of the other
19  gentlemen who worked beneath him.
20  Q.  If you can approximate from the 30th of June
21  until the date of Tina's accident on July 15th, how
22  many occasions would you see them cutting the grass?
23  A.  I want to say at least, at least once a week.
24  And it went on for even after her accident they

Page 77

1   continued to maintain the lawns.
2   Q.  Would you be able to provide us with an
3   approximation of how close to the building --
4   A.  Right up to the building.  I'm sorry.  Right up
5   to the hedges of the building.
6        MR. SNYDER:  Thanks.  I have no further
7   questions.
8   BY MR. DOERLER:
9   Q.  When the workers were in the building removing
10  stuff, did they have access to the entire building?
11  A.  They still had keys to the entire building.
12  Q.  All right.  But when they were in there when
13  you guys were in there, who directed them on where to
14  go?  Anybody?
15  A.  Unless I had a containment up, they pretty much
16  went where they wanted to go.  And that was
17  Mr. Camby's call.  It was up to him being the building
18  owner's representative as to whether or not they were
19  allowed in the building.
20       The general public on any job is not
21  allowed in the building while I'm working there.
22  Q.  Is it my understanding that if they wanted
23  access to the building they would have to talk to
24  Mr. Camby?

Case 1:05-cv-00163-GMS    Document 38-7    Filed 05/26/2006    Page 22 of 24

Mahoney                                              v. Benjamin Banneker Elementary School and Milford School District
James G. Mahoney, Sr.                  C.A. # 05-163 GMS                         February 13, 2006

Page 78

1  A. That's the protocol that they're supposed to
2  use. Whether they did or not, I don't know.
3  Q. Is it my understanding that you actually saw
4  Mr. Reid mowing the grass?
5  A. At one given time, yes. At least once that I
6  can recall.
7  Q. Do you know whether that was before or after
8  the fall?
9  A. I think it was before the fall.
10  Q. What makes you think it was before the fall?
11  A. I don't recall seeing him cut the grass after
12  that. It was cut -- let me rephrase that.
13      I do recall Mr. Reid cutting the grass one
14  time. I believe it was before the fall because they
15  had a sign out in front of the building depicting the
16  new building that was going up next door. Okay?
17      I also recall Mr. Sells coming on site and
18  remarking to the amount of trash that was on the
19  ground in front of the building that had blown up
20  against the building.
21  Q. Do you know if Mr. Sells directed somebody to
22  clean that up?
23  A. He had asked me if it was from my people and I
24  said no. Again, you have to understand this building,

Page 79

1  there was no fence around this building at all or
2  around any of the parking lots. It was open to the
3  public. It could just as easily have been someone
4  else who fell down those steps as it was her.
5  Q. The trash that was outside, do you know who
6  picked it up, if anybody?
7  A. I don't know.
8  Q. Was it picked up?
9  A. I probably picked up some of it if it belonged
10  to my people. But other than that -- I mean, there
11  were potato chip bags. That was an ongoing problem
12  the whole time. It wasn't my job to maintain that.
13  Q. Do you know if anybody picked up the trash?
14  A. I don't know.
15  Q. Did you work on other job sites on asbestos
16  abatement with Mr. Sells?
17  A. Mr. Sells has been an entity in the state or an
18  inspector for the state for years that I can remember.
19  I've seen him on numerous different abatement
20  projects.
21  Q. When he's on site does he inspect the outside
22  of the job as well as the inside?
23  A. His main focus is for him to inspect my work
24  areas and ensure that I'm doing my job properly and

Page 80

1  that whoever the consultant is doing their job
2  properly and to look for any flaws in workmanship or
3  any of my responsibilities.
4  Q. Does Mr. Sells conduct safety inspections?
5  A. Per se. If we're in an abatement job, yes, he
6  does. If he comes in and there's a breach of my
7  containment, okay, it's something that needs to be
8  dealt with. If he finds it, it can be a violation.
9  Q. Does he only inspect containment areas?
10  A. I don't know the entire realm of Mr. Sells'
11  responsibility. I can just tell you based off of the
12  years that I've had him walk on my sites, you know,
13  what me and him have addressed. As far as whether,
14  you know, what the rest of his responsibilities are as
15  the state inspector, I don't know.
16  Q. If he's in a building with you and notices as
17  you're going upstairs that one of the stairs is
18  deteriorating, is that something that he would make
19  somebody correct?
20  A. I don't know. He's a representative for the
21  State of Delaware so I'm assuming yes, he would bring
22  it to someone's attention.
23  Q. But you don't know whether it would be your
24  attention or --

Page 81

1  A. More than likely it would be Harvard's
2  attention. Now, a flaw in my work he would bring to
3  Harvard's attention and my attention.
4  Q. Meaning like a hole in the containment?
5  A. A hole in the containment, something as far as
6  safety that he sees me doing wrong or my people doing
7  wrong, he would immediately bring that to Harvard's
8  attention and mine.
9  Q. Did you see Mr. Marinucci on site with
10  Mr. Sells at all?
11  A. Not that I can recall, no.
12  Q. Were there weekly job site meetings on this
13  job?
14  A. Every Tuesday.
15  Q. Who was attending these meetings?
16  A. Myself, Mr. Morrison, Mr. Sells and Dwayne
17  Camby.
18  Q. And are there meeting minute notes from those
19  meetings?
20  A. There are not. Not that I'm aware of. I mean,
21  you can check with Mr. Morrison and Mr. Camby, but it
22  wasn't my responsibility.
23  Q. You didn't keep any notes?
24  A. No, I didn't.

21 (Pages 78 to 81)

Mahoney
James G. Mahoney, Sr.

v. Benjamin Banneker Elementary School and Milford School District
C.A. # 05-163 GMS                                February 13, 2006

Page 82

1  Q.  Do you know if Mr. Sells kept any notes?
2  A.  I can't specifically answer for him, no. I
3  don't know. Usually that's the consultant's
4  responsibility.
5  Q.  At the job site, these Tuesday meetings,
6  they're called job site meetings?
7  A.  They're basically Mr. Sells would arrive,
8  Mr. Morrison would arrive and Mr. Camby and myself
9  would already be there. We would discuss what work we
10  had done, what we were planning on doing and walk
11  through the building to look at the areas that we had
12  previously abated and discuss any problems that we may
13  see coming up or any problems that they may find.
14       And it was pretty much an informal meeting
15  every week.
16  Q.  If there were safety issues on the site, would
17  that be discussed then?
18  A.  Yes, it would. If there were safety issues
19  that would have came up, they would have went into
20  Mr. Camby's log and also mine.
21  Q.  By your saying your log, you're referring to
22  these daily log and safety reports that we looked at
23  earlier?
24  A.  There would be a notation in there. If

Page 83

1  Mr. Sells brought up a deficiency or Mr. Morrison had
2  a concern, it would have been written in these. And,
3  again, I'm not infallible. If I missed it, I'm sure
4  Mr. Camby would have put it in his -- one of the two
5  of us or both of us would have it in one of the two
6  logs.
7       MR. DOERLER:  I'm done.
8       MR. SNYDER:  I have no more questions.
9       (Deposition concluded at 3:20 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 84

1           I N D E X
2  DEPONENT:  JAMES G. MAHONEY, SR.           PAGE
3     Examination by Mr. Doerler          2
      Examination by Mr. Snyder          75
4     Examination by Mr. Doerler         77
5           E X H I B I T S
6  DEFENDANT'S DEPOSITION EXHIBITS         MARKED
7  1 Plymouth Environmental Co., Inc.
     employee biographies           13
8
   2 Schematic of Banneker Elementary School
9     first floor              19
   3 Schematic of Banneker Elementary School
10    lower level             34
11
   4 Hand-drawn diagram            38
12
   5 Accident/Injury Report Form dated
13   7/15/03                 45
14  6 Waiver of Service of Summons        66
15  ERRATA SHEET/DEPONENT'S SIGNATURE       PAGE 85
16  CERTIFICATE OF REPORTER           PAGE 86
17
18
19
20
21
22
23
24

Page 85

1
2
3       REPLACE THIS PAGE
4       WITH THE ERRATA SHEET
5       AFTER IT HAS BEEN
6       COMPLETED AND SIGNED
7       BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

22 (Pages 82 to 85)

Mahoney
James G. Mahoney, Sr.

v. Benjamin Banneker Elementary School and Milford School District
C.A. # 05-163 GMS                                    February 13, 2006

Page 86

```
 1   State of Delaware   )
                         )
 2   New Castle County   )
 3
 4            CERTIFICATE OF REPORTER
 5
         I, Kurt A. Fetzer, Registered Diplomate
 6   Reporter and Notary Public, do hereby certify that
     there came before me on Monday, February 13, 2006, the
 7   deponent herein, JAMES G. MAHONEY, SR., who was duly
     sworn by me and thereafter examined by counsel for the
 8   respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
 9   in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.
11        I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13        I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17            Kurt A. Fetzer, RDR, CRR
              Certification No. 100-RPR
18            (Expires January 31, 2008)
19
     DATED:
20
21
22
23
24
```