DUANE JOSEPH CAMBY

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAMES MAHONEY and TINA
MAHONEY, h/w,

    Plaintiffs,    :  NO.  05-163 GMS

-vs-

BENJAMIN BANNEKER ELEMENTARY
SCHOOL and MILFORD SCHOOL
DISTRICT,

    Defendants/Third-Party
        Plaintiffs,

-vs-

PLYMOUTH ENVIRONMENTAL CO.,
INC.,

    Third-Party Defendant.

TELEPHONE DEPOSITION OF:
DUANE JOSEPH CAMBY
APRIL 13, 2006

STREHLOW & ASSOCIATES
258 SOUTH STATE STREET
2ND FLOOR, REAR BUILDING
NEWTOWN, PENNSYLVANIA 18940
215-504-4622

EXHIBIT D

Strehlow & Associates, Inc.
(215) 504-4622

DUANE JOSEPH CAMBY

## Page 2

Telephone deposition was taken at the Law Offices of White and Williams, 824 North Market Street, Suite 902, Wilmington, Delaware, before ANNA MARIA FASCIANO, License No. 30X100200300, a Notary Public and Certified Shorthand Reporter of the State of New Jersey and Commissioner of Deeds of the Commonwealth of Pennsylvania, on April 13, 2006, commencing at 4:04 p.m.

STREHLOW & ASSOCIATES
215-504-4622

## Page 3

APPEARANCES

ROSEN, MOSS, SNYDER & BLEEFELD, L.L.P.
BY: MARC SNYDER, ESQUIRE
   8380 Old York Road, Suite 410
   Elkins Park, Pennsylvania 19027
   215-935-1000
   For the Plaintiff

WHITE and WILLIAMS, LLP
BY: WILLIAM DOERLER, ESQUIRE
   824 North Market Street, Suite 902
   Wilmington, Delaware 19899-0709
   302-654-0424
   For Defendant Milford School District

STREHLOW & ASSOCIATES
215-504-4622

## Page 4

INDEX

WITNESS                                    PAGE

DUANE JOSEPH CAMBY
(Via Telephone)
   DIRECT EXAMINATION BY MR. SNYDER       8
   CROSS EXAMINATION BY MR. DOERLER       41
   REDIRECT EXAMINATION BY MR. SNYDER     52

EXHIBITS

NUMBER        DESCRIPTION              PAGE

              (NONE MARKED)

REQUESTS FOR PRODUCTION:
   NONE

## Page 5

1  DUANE JOSEPH CAMBY,
2  (VIA TELEPHONE), HAVING BEEN DULY SWORN ACCORDING
3  TO LAW, WAS EXAMINED AND TESTIFIED AS FOLLOWS:
4       MR. SNYDER: Mr. Camby, can you hear me
5  okay?
6       THE WITNESS: Yes.
7       MR. SNYDER: Okay, this is Marc Snyder.
8  We've never met, but we have spoken. I
9  explained to you that we were going to be
10 taking your deposition today. And I also
11 explained to you that I represent Jim and Tina
12 Mahoney in a civil lawsuit they have filed
13 down in the District of Delaware against the
14 Milford School District.
15      Is that your understanding that
16 you're -- we're here today to take your
17 telephone deposition?
18      THE WITNESS: Correct.
19      MR. SNYDER: Okay. And you can hear me
20 okay?
21      THE WITNESS: Yes.
22      MR. SNYDER: Before we begin -- before
23 I begin asking you any substantive questions,
24 I'm just going to briefly give you some

DUANE JOSEPH CAMBY

Page 6

1  instructions, and I ask for you to closely
2  listen to the instructions. If there's
3  anything that either you can't hear me or you
4  don't understand, just stop me.
5      Is that okay?
6      THE WITNESS: Okay.
7      MR. SNYDER: First of all, on any
8  question that I ask you, I'm going to be --
9  try to be clear on my questions, but if
10 there's any question that I ask you that you
11 don't understand, the question itself, just
12 stop me and I'll repeat the question or
13 rephrase the question so you do understand the
14 question.
15     Is that okay?
16     THE WITNESS: Okay.
17     MR. SNYDER: There's also a question --
18 if there's a question that I ask you or any
19 question that you're asked either by myself or
20 Mr. Doerler where you don't know the answer,
21 we would just ask you not to give us a guess.
22     Is that okay?
23     THE WITNESS: Okay.
24     MR. SNYDER: However, if we ask you a

Page 7

1  question which you could provide an
2  approximation, maybe a time, a distance, a
3  date, but you don't have the exact -- an exact
4  answer, just let us know it's an approximation
5  and an educated guess and that's okay.
6      THE WITNESS: Okay.
7      MR. SNYDER: And just as we're doing
8  now, since everything that eventually is going
9  to make its way to a booklet, let's try not to
10 speak over each other even though you may be
11 able to anticipate my question, just allow me
12 to finish my question in its entirety and
13 likewise I'll allow you to finish your answer
14 in its entirety so we're not speaking over
15 each other.
16     Is that okay?
17     THE WITNESS: Okay.
18     MR. SNYDER: Is there any reason you
19 can think of why the deposition should not
20 proceed?
21     THE WITNESS: No.
22     MR. SNYDER: Okay. And one other
23 thing, if for any reason you need to take a
24 break, just let us know and we'll put you on

Page 8

1  hold and we'll accommodate you.
2      Is that good?
3      THE WITNESS: Okay, thank you.
4
5  DIRECT EXAMINATION
6  BY MR. SNYDER:
7      Q.  Okay. What is your present address?
8      A.  1811 Barton Springs Court, Allen, Texas
9  75002.
10     Q.  And do you plan on being at this
11 address for the immediate future?
12     A.  Yes.
13     Q.  Okay. Who's your present employer?
14     A.  It's a company called Farmers &
15 Associates.
16     Q.  Could you spell that?
17     A.  Farmers, F-A-R-M-E-R-S, and Associates.
18     Q.  And what kind of work do you for
19 Farmers & Associates?
20     A.  Same work; environmental, dealing with
21 asbestos, lead and mold.
22     Q.  Could you just briefly go through your
23 education and your training?
24     A.  I have an Associate's degree in

Page 9

1  criminal justice. I've been doing what I've been
2  doing for the last nine years; and that is, working
3  for environmental consulting companies.
4      Q.  And do you have any type of
5  certifications or any type of training or education
6  aside from on-the-job training which you believe
7  qualifies you for your position?
8      A.  Yes, I do. I obtain three licenses.
9      Q.  What types of licenses?
10     A.  Project management license, an asbestos
11 inspector license, and an asbestos air monitoring
12 license.
13     Q.  Are these state licenses or something
14 other than that?
15     A.  They are state licenses, yes.
16     Q.  In what state or states are you
17 licensed?
18     A.  Texas, and currently right now in
19 Delaware.
20     Q.  Okay. How long have you lived in
21 Texas?
22     A.  Over ten years.
23     Q.  Okay. For a while, were you living in
24 Delaware and working in Delaware?

DUANE JOSEPH CAMBY

Page 10

1  A. Yes.
2  Q. Okay. And you worked for a company
3  called Harvard Environmental?
4  A. Yes.
5  Q. For how long did you work at Harvard
6  Environmental?
7  A. Two and a half to three years.
8  Q. And would you either approximate or
9  know for certain the time that you started -- the
10 date that you started and the date that you left?
11 A. December of '03.
12 Q. Is when you left?
13 A. No, is when I started. When I left was
14 January '06.
15 Q. The incident occurred, or the questions
16 that I'm going to be asking you occurred in the
17 summer of 2003. Does that help refresh your memory
18 of when you were working at Harvard?
19 A. That's correct. Yes, I started Harvard
20 in 2002, I'm sorry.
21 Q. Okay.
22 A. December of 2002.
23 Q. And you left in '06?
24 A. Yes.

Page 11

1  Q. And did you move to -- so you just
2  recently left Harvard?
3  A. Yes, I did.
4  Q. And what were the reasons that you left
5  Harvard?
6  A. I did not like living in Delaware.
7  Q. Okay. And did you have the same
8  position during your entire employment with Harvard?
9  A. Yes.
10 Q. And what was that position?
11 A. Project manager.
12 Q. Would you be able to describe and
13 summarize your job responsibilities as a project
14 manager for Harvard?
15 A. Yes, went out and did building surveys,
16 checking for asbestos prior to demo or renovation. I
17 also did air monitoring while these services were
18 provided as far as removal of asbestos, lead and
19 mold.
20 Q. Do you recall working on an asbestos
21 abatement program at the Banneker Elementary School?
22 A. Yes.
23 Q. And is it accurate that you worked as a
24 project manager at that particular project?

Page 12

1  A. Yes.
2  Q. And who was your direct supervisor, if
3  you recall?
4  A. Chuck Styles.
5  Q. Styles, S-T-I-L-E-S?
6  A. S-T-Y-L-E-S.
7  Q. And what was Mr. Styles' position at
8  Harvard?
9  A. Operations manager.
10 Q. To the best of your knowledge, is Mr.
11 Styles still employed with Harvard?
12 A. Yes, he is.
13 Q. Was Mr. Styles on site at the Banneker
14 School project?
15 A. No, actually it was Wes Morrison, the
16 owner.
17 Q. Okay. Now, how frequently were you on
18 site at this particular project?
19 A. Every day.
20 Q. Okay. And how frequently was Mr.
21 Morrison on site?
22 A. He was there once -- to start off, once
23 a week for progress meetings. And then it got to
24 like once every two weeks, if I remember correctly.

Page 13

1  Q. Was anybody else from Harvard, aside
2  from you and Mr. Morrison, on site?
3  A. No.
4  Q. Now, would you be able to summarize the
5  scope of Harvard's responsibilities at the Banneker
6  Elementary School?
7  A. Our responsibility was to do air
8  monitoring while the asbestos was being removed. And
9  to make sure Plymouth Environmental was doing the
10 removal by the rules and regs of the State of
11 Delaware.
12 Q. Is it an accurate statement you were
13 overseeing Plymouth's work?
14 A. Yes.
15 Q. Okay. And as far as you know, was
16 that -- you were complying with the state
17 requirement?
18 A. Yeah, I just -- like I said, I was just
19 there to make sure that Plymouth was doing what
20 they're, you know, the removal the correct way by the
21 rules and regs.
22 Q. Okay.
23 A. And also doing air monitoring inside
24 and outside of the containments.

DUANE JOSEPH CAMBY

**Page 14**

1  Q. You were doing the air monitoring or
2  Plymouth was doing the air monitoring?
3  A. I was.
4  Q. Who was your contact person from the
5  school district?
6  A. John Marinucci.
7  Q. And what kind of interaction did you
8  have with Mr. Marinucci?
9  A. I'd see him sometimes twice a week to
10 one time a week, especially at the progress meetings.
11 Q. Did Mr. Marinucci attend any of
12 Harvard's progress meetings? Or strike that
13 question, let me ask it differently.
14     Did you have progress meetings or daily
15 meetings or something of that nature?
16 A. Yes.
17 Q. And who attended those meetings?
18 A. It was me --
19    MR. DOERLER: Wait, wait.
20    THE WITNESS: Jim Mahoney.
21    MR. DOERLER: I'm going to object to
22    the form of that question. I think they
23    actually had daily meetings and second, they
24    had project meetings.

**Page 15**

1  BY MR. SNYDER:
2  Q. Okay. And Mr. Doerler objected to the
3  question and he -- what he said was, and let us know
4  if he's accurate, he said there was daily meetings as
5  well as progress meetings, and I sort of lumped them
6  together; is that accurate?
7  A. Yes.
8  Q. Okay. And what was the purpose of the
9  daily meetings?
10 A. As far as the daily meetings, what are
11 you talking about?
12 Q. Did Harvard conduct daily meetings?
13 A. No.
14 Q. Did you attend any daily meetings on
15 behalf of Harvard?
16 A. No, just the progress meetings, that's
17 it.
18 Q. Okay. And how frequently did Harvard
19 have progress meetings?
20 A. Once a week.
21 Q. Okay. Who attended these progress
22 meetings?
23 A. Me, Jim Mahoney, Wes Morrison, John
24 Marinucci.

**Page 16**

1  Q. Who conducted them?
2  A. Mr. Morrison.
3  Q. What kinds of things were discussed at
4  the progress meetings?
5  A. The progress of the job, the phases and
6  where we were as far as -- into the job.
7  Q. Okay. Did you attend any other
8  meetings aside from the once a week Harvard meetings?
9  A. No.
10 Q. Okay. Records that I was provided
11 indicate that you arrived on the job site at, I'm
12 sorry, on June 30, 2003; does that sound about
13 accurate?
14 A. Yes.
15 Q. Okay. Now, would you be able to
16 summarize what the job was, what the job consisted
17 of?
18 A. Well, the bulk of it was floor tile,
19 removal of floor tile mastic. There was some pipe
20 insulation in the walls. There were mastic, a glue
21 mastic behind the chalkboards.
22 Q. What was that word?
23 A. Mastic, like a glue mastic.
24 Q. Could you spell that?

**Page 17**

1  A. Mastic?
2  Q. Yes.
3  A. M-A-S-T-I-C.
4  Q. Okay.
5  A. That holds up the chalkboards, we had
6  to remove all those. And that's all I can remember.
7  Q. Okay. And what did you do when you
8  arrived on the job site?
9  A. Well, every day I would arrive and
10 we'd -- me and Jim would discuss what we're going to
11 try to finish that day, how he was going to do it,
12 where he wanted to be at lunchtime and where he
13 wanted to be at the end of the day.
14 Q. And Jim would be Jim Mahoney; is that
15 accurate?
16 A. Correct.
17 Q. Okay.
18 A. And then I would start -- when his guys
19 went inside, I would start my air samples.
20 Q. Okay. And had you ever worked with
21 either Jim Mahoney or Plymouth prior to this job?
22 A. I believe I worked with Plymouth but
23 not Jim Mahoney.
24 Q. And how -- when did you work with

DUANE JOSEPH CAMBY

**Page 18**

1 Plymouth before this job?
2   A. I cannot remember.
3   Q. Did you ever work with Jim Mahoney
4 after this job?
5   A. For half a day; I sat in for someone
6 for half a day on a lead job.
7   Q. Okay. Now, when you arrived on the job
8 site, was there any furnishings or fixtures in the
9 school?
10  A. Yes.
11  Q. And what did that consist of?
12  A. Desks, mainly your school furniture. I
13 mean, desks. In the library, there were shelves that
14 needed to be removed and tables and chairs and desks
15 and...
16  Q. Were the desks and tables and chairs
17 concentrated in one area or were they spread out
18 throughout the school and in the classrooms?
19  A. They were spread out a little -- well,
20 they were spread out, but they had been working on it
21 and started to move it but did not complete it.
22 Actually, if I had to draw in my head, I could
23 probably tell you exactly where it was. But without
24 the drawing, I can't do that.

**Page 19**

1   Q. Okay. And how if at all did either
2 your work or Plymouth's work, did it have to revolve
3 around the removal of the fixtures and equipment and
4 desks and chairs and tables from the classrooms?
5   A. How was it in our way, is that what
6 you're --
7   Q. Yeah. Was it in your way, did you have
8 to work around that at all?
9   A. Yes, we did.
10  Q. Okay. And how did you have to work
11 around it?
12  A. Well, we had to accommodate them to let
13 them get all the furniture out and to have them put
14 it in the gym.
15  Q. Okay. And when you refer to them, who
16 are you referring to?
17  A. The maintenance.
18  Q. And that would be the school district
19 maintenance staff?
20  A. Correct.
21  Q. How long into the asbestos project do
22 you recall seeing the school district's maintenance
23 staff moving the furniture within the school?
24  A. The whole project.

**Page 20**

1   Q. And would you be able to provide us
2 with the number of maintenance people that you
3 observed moving the furniture and the fixtures and
4 stuff into the school -- or to the gymnasium and
5 cafeteria?
6   A. It started off, I have to say four,
7 maybe five guys and it just kind of went down. There
8 was some -- I know they tried to do most of it on the
9 weekends while we weren't there. But, you know, they
10 were there consistently throughout the week as well.
11 It went -- it started, like I said, it started off
12 with five, probably went down to maybe two or three
13 towards the end there.
14  Q. If I mentioned any names, would that
15 assist you or would you be able to recognize any
16 names of the maintenance people?
17  A. No.
18  Q. Okay. How if at all did the movement
19 of the furniture and fixtures and things like that
20 impede your work progress?
21      MR. DOERLER: Objection.
22      You can answer.
23      THE WITNESS: Well, it didn't. It
24   didn't because we worked around it.

**Page 21**

1 BY MR. SNYDER:
2   Q. Okay.
3   A. What we did was Plymouth -- what
4 Plymouth did was they did it in phases. And by doing
5 it in phases, we were able to work around it.
6   Q. Okay. Now, did -- aside from the
7 school maintenance people and yourself and Mr.
8 Morrison and the Plymouth folks, did you ever observe
9 anybody from the public in the school?
10  A. No.
11  Q. Did you ever observe anybody from the
12 general public outside of the school?
13  A. Yes.
14  Q. Okay. And who did you observe and what
15 did you observe them doing?
16  A. Well, there were people that came in
17 wanting to get -- just asking for can I get this and
18 that, just to have a memory of the school because it
19 was an old school. People would come and get bricks
20 off the school. Some people -- one guy came and got
21 the flagpole. Because the school apparently had some
22 history to it.
23  Q. Did you have an understanding of what
24 the school district was intending to do with the

6 (Pages 18 to 21)

DUANE JOSEPH CAMBY

**Page 22**

1  desks and chairs and shelves and stuff that they --
2  their maintenance folks had moved into the gymnasium
3  and cafeteria?
4      A.   No. But later on I found out that they
5  were -- they had a sale where the public would come
6  in and buy pieces of, or desks or whatever they
7  wanted to buy.
8      Q.   And do you know whether they had this
9  sale prior to the time that you left the project?
10     A.   No, they had it while we were still
11 there, but they held it on the weekend.
12     Q.   Okay. And do you know how far --
13 strike that.
14          Do you know whether the sale was on one
15 day or more than one day?
16     A.   I have no idea.
17     Q.   Using the date of Mrs. Mahoney's
18 accident as a frame of reference and that would be
19 July 15th, do you have a recollection of whether the
20 sale was before or after the date of Mrs. Mahoney's
21 accident?
22     A.   Before.
23     Q.   Okay. Did the school district's
24 maintenance personnel have free access to the

**Page 23**

1  interior of the building during the abatement
2  project?
3      A.   Yes.
4      Q.   Okay. And would that be in -- let me
5  qualify that question, I mean in the none -- the
6  areas that were not in containment?
7      A.   Oh, yeah. I wouldn't -- no, there's no
8  way I would let them in the containment.
9      Q.   Okay. So it's accurate that the
10 containment areas were restricted, but in the
11 non-containment areas, the maintenance people had
12 free access?
13     A.   Yes.
14     Q.   Were the doors locked at nighttime, as
15 far as you know?
16     A.   Yes.
17     Q.   And did you have a key to get in -- key
18 or keys to get into the school?
19     A.   Yes.
20     Q.   Do you know if the maintenance people
21 retained their keys?
22     A.   They had to cause they were in there
23 sometimes when we weren't.
24     Q.   Okay. How closely did you work with

**Page 24**

1  Jim Mahoney during this project?
2      A.   Close.
3      Q.   And you discussed -- you said that you
4  had discussions with him in the mornings about his
5  expectations of what needed to be done by lunchtime;
6  is that accurate?
7      A.   Yes.
8      Q.   Did you continue to speak with him
9  during the course of the typical day?
10     A.   Oh yeah.
11     Q.   Okay.
12     A.   We shared the same office.
13     Q.   And in the course of a typical day, for
14 how long would you estimate that you spoke or saw Mr.
15 Mahoney?
16     A.   All day.
17     Q.   Okay. And what was his -- your
18 understanding of his job responsibilities?
19     A.   To make sure that he got the -- do --
20 well, just make sure he did everything by the rules
21 and regs of the State of Delaware to remove all the
22 asbestos.
23     Q.   And how would you describe Mr.
24 Mahoney's concern for job safety?

**Page 25**

1      A.   Good. He cares for his guys.
2      Q.   Did you have any concerns that Mr.
3  Mahoney was not conforming with the rules and
4  regulations imposed by the State of Delaware?
5      A.   No. No. He did a good job.
6      Q.   What about Mr. Mahoney's crew, the
7  same?
8      A.   Good crew. Good crew. I'd work with
9  him again.
10     Q.   Did anybody from either the school
11 district or the State of Delaware inform you that
12 they had any concerns about either Mr. Mahoney's
13 concern for job safety or any person in his crew,
14 same question, their concerns about their conformity
15 or concerns with job safety?
16     A.   No.
17     Q.   Did anybody from either the school
18 district or the state communicate to you any concern
19 they had about the work product of either Mr. Mahoney
20 or his crew?
21     A.   No. As a matter of fact, Bob Sells who
22 is a regulator for the State of Delaware came by
23 very, very, very often.
24     Q.   And when you say regulator, in laymen's

DUANE JOSEPH CAMBY

### Page 26

1  terms what was your understanding of Mr. Sells' role?
2  A.  He works for the State of Delaware and
3  his job is to go out to do air monitoring -- I mean,
4  well, asbestos removal jobs and to make sure they're
5  doing it right.
6  Q.  And did you have an understanding of
7  the interaction between Mr. Sells and Mr. Mahoney,
8  how frequently they speak?
9  A.  I was right there the whole time.
10 Q.  Okay. And how frequently was Mr. Sells
11 on the job site?
12 A.  Oh, there would be times when he was
13 there, it started off twice a week and then once a
14 week and then once every other week the closer we got
15 done.
16 Q.  Okay. And did you and Mr. Sells ever
17 discuss the job performance of either Mr. Mahoney or
18 his Plymouth crew?
19 A.  No. When he showed up on site, he
20 would come in and look at everything and make sure
21 everything was okay. Me and Mr. Mahoney were right
22 there.
23 Q.  Okay.
24 A.  Because if he's not doing his job

### Page 27

1  right, that means I'm not doing my job right.
2  Q.  Him being Mr. Mahoney?
3  A.  That's right.
4  Q.  Aside from your observations of a
5  maintenance staff of four or five from the school
6  district moving furniture, did you observe them to
7  have any other type of presence at the school during
8  your involvement at this project?
9  A.  No.
10    Are you there?
11 Q.  Yes.
12 A.  Okay.
13    No, I can't remember. I think they
14 might have came in and done some type of work to the
15 electrical.
16 Q.  What kind of work?
17 A.  I have no idea, just looking at the
18 electrical boxes and whatnot. Cause you've got to
19 remember, that school was being demoed to the ground.
20 Q.  And if there was a problem with the
21 electrical wiring or the electrical system, is that
22 something that you would look to the maintenance
23 people to --
24 A.  I don't know. I think Mahoney actually

### Page 28

1  hired out someone to hook up his temporary box. So
2  if we had a problem with electric, you know, Mahoney
3  actually did that.
4  Q.  Okay.
5  A.  And again, I mean, the maintenance was
6  there. I mean, they had stuff in some boiler rooms
7  stacked up almost to the ceiling. It took them
8  forever and a day to get all that out.
9  Q.  I missed the word, basement, what did
10 you say after basement?
11 A.  Boiler room.
12 Q.  Balloon?
13    MR. DOERLER: Boiler room.
14    MR. SNYDER: Boiler room, okay, I'm
15 sorry.
16    THE WITNESS: I'm sorry, guys, I have a
17 bad southern accent.
18    MR. SNYDER: Sorry about that.
19 BY MR. SNYDER:
20 Q.  And what did you say was stacked in the
21 boiler room?
22 A.  Just -- you name it. It's -- I can't
23 even list it.
24 Q.  And do you have an understanding of

### Page 29

1  what was being done with the stuff that was stacked
2  in the boiler room?
3  A.  I don't know what they did with that.
4  Q.  Okay. Did you see them going to and
5  from the boiler room, either stacking or unstacking
6  the stuff?
7  A.  No. I just knew they had to get it out
8  and they got it out.
9  Q.  Okay. And were they doing this during
10 the course of the project?
11 A.  Yeah.
12 Q.  Okay. Well, let's say -- if there was
13 some type of debris or other type of impediment
14 which would restrict your access or Plymouth's access
15 to the building from the exterior of the building,
16 would that be something that you would look to the
17 maintenance people to clear up?
18    MR. DOERLER: Objection.
19    You can answer.
20    THE WITNESS: No.
21 BY MR. SNYDER:
22 Q.  Okay. Who would be responsible for
23 cleaning that up?
24 A.  I don't know, but I would call John

DUANE JOSEPH CAMBY

### Page 30

1  Marinucci to try to find out.
2  Q. Okay. And what kind of interaction
3  again did you have with Mr. Marinucci during the
4  course of this job?
5  A. Just mainly as far as the progress on
6  the job, where we were at the time and how far along
7  we are and if we're on schedule.
8  Q. Okay. Let's say hypothetically a
9  railing to the necessary steps became dislodged where
10 you felt it would affect the safety of either you or
11 the Plymouth people, how if at all would you look to
12 the school district to remedy?
13     MR. DOERLER: Objection.
14     You can answer.
15     THE WITNESS: I would call John.
16 BY MR. SNYDER:
17 Q. Okay. Why would you call John?
18 A. Cause that wasn't not -- I'm going to
19 ask Mahoney to fix it. It's not, you know, that has
20 nothing to do with me and him.
21 Q. What do you base that answer on?
22 A. Well, Marinucci was my client contact.
23 If I have a problem with something like that, I would
24 call him.

### Page 31

1  Q. Okay. Now, I'll represent to you that
2  at Mr. Marinucci's deposition... just give me a
3  moment. I'm going to read a question and give you
4  Mr. Marinucci's answer. And I'd like you to tell us
5  whether you agree or disagree of your understanding
6  of -- whether you agree or disagree with Mr.
7  Marinucci's answer.
8  A. Marinucci or Mahoney?
9  Q. Mr. Marinucci.
10 A. Okay.
11 Q. My question was, was there an
12 expectation by either you or the school district that
13 Plymouth Environmental or Harvard would inspect the
14 exterior of the building for potentially hazardous or
15 dangerous conditions. And his answer was, it was my
16 expectation that Plymouth would manage and control
17 the job site.
18 A. Disagree.
19 Q. Okay. Now, what is your basis for
20 disagreeing that --
21     MR. DOERLER: Before you answer that,
22     what page are you reading from?
23     MR. SNYDER: This is page 26 of Mr.
24 Marinucci's deposition.

### Page 32

1  BY MR. SNYDER:
2  Q. And let me read further. Question:
3  And would the job site based on your expectation
4  include the exterior of the Banneker building?
5  Answer: Yes. Yes the immediate exterior around the
6  building.
7     Agree or disagree?
8  A. Disagree.
9  Q. And what is your basis for disagreeing?
10 A. Because we weren't there to do any type
11 of work outside that school. We were there to do the
12 work inside.
13 Q. And what is your basis for that
14 opinion? How did you come to that conclusion, that
15 you were not there to -- that you were there for the
16 inside?
17 A. That's where the asbestos is.
18 Q. Okay. Did you ever see either --
19 strike that.
20     Did you ever see anybody maintain the
21 exterior of the school property including the lawn
22 during the time that you were at the project?
23 A. I want to say no. I never did, no.
24 Q. Okay. Do you have an opinion as to who

### Page 33

1  was responsible for maintaining the exterior stairs?
2     MR. DOERLER: Objection.
3     THE WITNESS: No, I don't.
4  BY MR. SNYDER:
5  Q. Okay. If you observed a problem with
6  the exterior stairs, what, if anything, would you do
7  if you felt that problem would impede upon the safety
8  of either you or the Plymouth people?
9     MR. DOERLER: Objection.
10    THE WITNESS: I'd call Marinucci and
11    tell him about it.
12 BY MR. SNYDER:
13 Q. Would you have an expectation of what
14 Marinucci would do?
15 A. No. I have no idea.
16 Q. In Marinucci's deposition, he testified
17 that he recalled a dangerous condition, and indulge
18 me for a moment, I'm looking for the page.
19     It's page 28 and 29 for the record.
20 Where he recalled Jim Mahoney had taken off a
21 hardwood door from one of the frames and laid it down
22 over the steps to use as a makeshift ramp to roll
23 equipment into the building; do you recall that?
24 A. No.

DUANE JOSEPH CAMBY

**Page 34**

1  Q.  Would you have expected to recall that
2  if that did occur?
3  A.  Yeah.
4  Q.  I'm going to read you some questions
5  and answers Mr. Marinucci -- again, it's page 29 --
6  A.  Marc, could you hold on one second?
7  Q.  Sure.
8        * * * *
9        (Whereupon a discussion was held off
10       the record.)
11       * * * *
12 BY MR. SNYDER:
13  Q.  That is starting on line 6 page 29.
14 Quite frankly -- this is Mr. Marinucci. Quite
15 frankly, sir, they did not seem to care. Question:
16 They didn't seem to care about the door serving as a
17 ramp or is that a broader statement that you're
18 making. Answer: That's a broader statement. Why
19 don't you explain that please. Answer: They didn't
20 seem to care about job safety.
21       And I'll represent to you they were --
22 he was referring to Plymouth and Mr. Mahoney. Do you
23 agree or disagree with Mr. Marinucci's
24 characterization of Mr. Mahoney?

**Page 35**

1  A.  I disagree.
2  Q.  Okay.
3  A.  Can I tell you why?
4  Q.  Please.
5  A.  Because after the project was done we
6  actually obtained, okay, meaning Harvard as we, we
7  obtained and actually got state -- well, let me put
8  it this way. The Benjamin Banneker job went so well,
9  it helped us get more clientele.
10  Q.  And is that something that you give
11 credit to the work of --
12  A.  That's correct.
13  Q.  Let me just finish, of Mr. Mahoney and
14 Plymouth?
15  A.  Yes.
16  Q.  Okay. I just want to go through with
17 you to the extent you have any knowledge about Mrs.
18 Mahoney's accident.
19       When did you first learn that Mrs.
20 Mahoney was involved in an accident?
21  A.  When she came into the office with me
22 and her husband, where me and Jim was.
23  Q.  And do you have an understanding of
24 approximately how much after her accident she came

**Page 36**

1  into the office?
2  A.  Right away.
3  Q.  And did you -- do you have a
4  recollection of what your observation was of her
5  physical condition?
6  A.  She was hurt.
7  Q.  Were there any bruises or blood or
8  limping or something of -- anything like that?
9  A.  Yes, and her leg -- her knee was
10 swollen.
11  Q.  Do you remember which knee?
12  A.  No.
13  Q.  Okay. Did she describe for you and her
14 husband what had happened?
15  A.  Not at that present time cause Jim took
16 her to the hospital.
17  Q.  Okay. Did you ever speak to anybody
18 and that would include Mrs. Mahoney or Mr. Mahoney or
19 anybody else, and gain an understanding about how
20 Mrs. Mahoney got hurt?
21  A.  Well, when she left, I talked to Allen.
22  Q.  And that would be Allen Lawson?
23  A.  That's correct.
24  Q.  And what did Allen tell you?

**Page 37**

1  A.  He told me -- he actually showed me how
2  it happened.
3  Q.  And do you remember what he showed you?
4  Would you be able to describe what he showed?
5       MR. DOERLER: Objection.
6       THE WITNESS: Well, we were outside and
7       we went outside and I kept saying what
8       happened, what happened, what happened. And
9       he just brought me outside and goes right
10      here, she fell down right here. I was like
11      oh, okay.
12 BY MR. SNYDER:
13  Q.  And just for the record, can you just
14 describe, clarify where is right here?
15  A.  The stairs or stairwell outside. It's
16 sort of like abandoned stairs, concrete stairs. I
17 want to say on the south side of the school.
18  Q.  And what were -- did Mr. Lawson point
19 to you -- strike that.
20       Did Mr. Lawson indicate to you that he
21 was an eyewitness to the accident?
22  A.  Yeah.
23  Q.  Okay. And did he point to you where he
24 observed Mrs. Mahoney to fall?

10 (Pages 34 to 37)

DUANE JOSEPH CAMBY

## Page 38

1  A. No, just -- he just pointed to the
2  stairs, I mean that was it.
3  Q. Okay. And just sitting here today, do
4  you -- do you have an understanding of where on the
5  stairs Mrs. Mahoney fell?
6  A. Exactly where, no. I mean, you know,
7  no.
8  Q. Okay. And that's fine.
9     So you don't know if it was on a
10 particular step on the platform, the right side or
11 the left side?
12 A. No. No.
13 Q. Okay. And aside from your conversation
14 with Mr. Lawson, did you have any other conversations
15 with anybody who gave you some insight on the
16 accident?
17 A. Mahoney.
18 Q. Mr. or Mrs.?
19 A. Mr.
20 Q. And what did he tell you?
21 A. Same thing Allen told me.
22 Q. Okay. Now, had you ever used those
23 steps before the accident?
24 A. Yeah.

## Page 39

1  Q. Did you make any observations of the
2  steps?
3  A. We had some, you know, they weren't the
4  best steps in the world. I mean, some loose gravel
5  on the steps. And I can't even remember if there was
6  a handrail on it. I can't even remember that.
7  Q. Okay. Do you recall what was done --
8  strike that.
9     Were the steps restricted, to the best
10 of your knowledge, after Mrs. Mahoney's accident?
11 A. No.
12 Q. Jim Mahoney in his deposition testified
13 that he placed safety tape?
14 A. If he did, I didn't see any. I didn't
15 go out there.
16 Q. Okay. Do you recall whether you used
17 those steps after Mrs. Mahoney's accident?
18 A. No. Because the inside access was
19 available then.
20 Q. And do you have knowledge or
21 recollection of whether the inside access was
22 available at the time that Mrs. Mahoney was walking
23 down the steps?
24 A. I don't remember. I mean, I don't want

## Page 40

1  to guess.
2  Q. And do you have an opinion as to who
3  was responsible for maintaining those steps?
4     MR. DOERLER: Objection.
5     THE WITNESS: No. The school district
6     owns that property, so...
7  BY MR. SNYDER:
8  Q. Are you finished?
9  A. Yes, that's it.
10 Q. Okay. And what if at all significance
11 do you have to what you say that the school district
12 owned the property?
13 A. Well, I mean they're tearing that
14 school down for a reason. It wasn't in the best
15 shape in the world.
16 Q. Okay. Do you feel that Plymouth had
17 any responsibility for the maintenance of those
18 steps?
19 A. No.
20    MR. DOERLER: Objection.
21 BY MR. SNYDER:
22 Q. Do you feel Harvard had any
23 responsibility for the maintenance of those steps?
24 A. No.

## Page 41

1  Q. Do you feel there's any entity who,
2  aside from the school district, who had
3  responsibility at any time for the maintain ence of
4  those steps?
5     MR. DOERLER: Objection.
6     THE WITNESS: The owner of that
7     building.
8  BY MR. SNYDER:
9  Q. Okay.
10 A. The owner of the property.
11 Q. Which, to your understanding, was the
12 school district?
13 A. Correct.
14 Q. Thank you, sir. I have no further
15 questions. I'm sure Mr. Doerler has some questions
16 for you.
17
18 CROSS EXAMINATION
19 BY MR. DOERLER:
20 Q. I do have some questions.
21    You testified about the maintenance
22 people being in the building. It was my
23 understanding, or well...
24    Did you have any control over their

DUANE JOSEPH CAMBY

### 42

1  access to the building?
2  A. No.
3  Q. They didn't have to check with you
4  prior to entering the building if you were there?
5  A. No. No. No.
6  Q. When did they come in and remove the
7  materials?
8  A. Like regular work hours.
9  Q. They didn't do it on -- in the evenings
10 or on the weekends?
11 A. I believe they did some on the weekends
12 as well, too.
13 Q. I noticed in the records that Harvard
14 filled out some daily reports. Did you fill those
15 out?
16 A. Uh-humm, yes.
17 Q. And on those reports it appears that
18 you reported visitors to the site; is that accurate?
19 A. Yes.
20 Q. And would you have included visits by
21 the maintenance people on your reports?
22 A. No.
23 Q. And why is that?
24 A. Well, I mean, I've been doing this nine

### 43

1  years. You don't -- visitors meaning Bob Sells,
2  people that pertain to what I'm doing out there, and
3  that is dealing with asbestos. Not maintenance
4  people coming in and out of their own building, no.
5  I can't stop them from doing it. That has nothing to
6  do with what I'm trying to do out there.
7          Now, I want to say I remember putting
8  Marinucci down coming to visit. But again, he was
9  there because of what I was doing.
10 Q. All right. And can you give me a rough
11 estimate of how many times the maintenance people
12 were in the school with you from June 30th to before
13 the time that Mrs. Mahoney fell on July 15th?
14         MR. SNYDER: I'm going to object to the
15    form of the question.
16         Do you mean accompanied by Mr. Camby or
17    during the dates that Mr. Camby was at the job
18    site?
19 BY MR. DOERLER:
20 Q. I mean during the days that you were on
21 the job site?
22 A. I have no idea. I mean, they were
23 there pretty much the whole project.
24 Q. You said they were there the whole

### 44

1  project and then I believe you said that they sold --
2  they had a sale of these furnishings before?
3  A. Yeah, they didn't sell it all.
4  Q. All right. Were -- is it -- were they
5  done moving the furniture by the time they had the
6  sale?
7  A. I don't remember.
8  Q. And what were they in the building
9  doing after they had the sale?
10 A. Moving furniture.
11 Q. So they were still moving furniture
12 after they had the sale?
13 A. Yeah.
14 Q. There was some discussion about an
15 electric box and Mr. Mahoney hiring an electrician?
16 A. Yeah, when he -- he has to hire his own
17 electrician to set up a temp electrical panel.
18 That's his job, because I can't remember why he had
19 to have the old temporary electrical panel, but I'm
20 pretty sure you can look into it and find out why
21 but...
22 Q. All right. And --
23 A. All the power we run, his air machines,
24 his, you know, all of his stuff that we had to run,

### 45

1  we have to use an electrical panel. It's in the
2  specs as well.
3  Q. Was the electric turned off in the
4  building?
5  A. I don't think it was, no. No. Like I
6  said, I can't remember if they came in and looked at
7  the electrical panel. I think what they were doing
8  is just prepping the school, cause as soon as we were
9  done, the general contractor was coming in right
10 behind us to tear it down.
11 Q. Have you been involved in any other
12 school demolition projects?
13 A. Yes.
14 Q. And in those projects, do the school
15 districts repair defects on the outside of the
16 building?
17 A. No.
18 Q. How many projects have you been
19 involved with that were school demolition projects?
20 A. A lot. I can't remember.
21 Q. Do you keep in touch with Mr. Mahoney
22 at this point?
23 A. No.
24 Q. Okay. When Mrs. Mahoney came into your

12 (Pages 42 to 45)

DUANE JOSEPH CAMBY

**Page 46**

1  office, was she complaining -- you said that she was
2  complaining that her knee hurt; is that right?
3     A.   Yes.
4     Q.   Was she complaining that one knee or
5  both knees hurt?
6     A.   One.
7     Q.   And you said that Mr. Mahoney took her
8  to the hospital. It's my understanding that Mr.
9  Lawson took her to the hospital, but you believe that
10 Mr. Mahoney took her?
11    A.   I don't remember. It was one of them.
12    Q.   You said that you used the steps where
13 Mrs. Mahoney fell prior to the time that she fell.
14 Can you tell me why you were using the steps?
15    A.   To go down to the lower level.
16    Q.   And was it the same day that she fell?
17    A.   No.
18    Q.   And why would you need to have -- to go
19 outside to get to the lower level?
20    A.   Because of the -- I couldn't go inside
21 the containment that was blocking the interior
22 entrance.
23    Q.   Okay. And do you know, can you give me
24 any kind of a rough estimate as to how many days it

**Page 47**

1  was prior to the time that Mrs. Mahoney fell?
2     A.   Not without looking at the paperwork
3  and specs, no.
4     Q.   And what would the paperwork and specs
5  show you?
6     A.   What day and time we were in that
7  particular phase where the interior was closed off.
8     Q.   Do you remember what phase that was?
9     A.   I have no idea.
10    Q.   You said that you noticed that there
11 was loose gravel on the steps; am I correct?
12    A.   That's correct.
13    Q.   Did you report that loose gravel
14 condition to anybody?
15    A.   No.
16    Q.   And why was that?
17    A.   Don't know. I didn't have to.
18    Q.   Do you remember what clothes Mrs.
19 Mahoney was wearing when she fell?
20    A.   Yes.
21    Q.   Can you tell me what that was?
22    A.   Shorts, tennis shoes, T-shirt.
23    Q.   And did Mrs. Mahoney mention anything
24 about carrying anything when she fell?

**Page 48**

1     A.   I don't remember.
2     Q.   And what were Mrs. Mahoney's duties on
3  the job site?
4     A.   For the most part, she did Mr.
5  Mahoney's paperwork.
6     Q.   Was that both before and after the
7  fall?
8     A.   Yes.
9     Q.   Did she do any abatement work other
10 than paperwork?
11    A.   I believe she did some prepping.
12    Q.   And how long during a typical day would
13 she be prepping?
14    A.   Not long.
15    Q.   Would it be an hour or more, or an hour
16 or less?
17    A.   Hour or more.
18    Q.   Would it be less than two hours?
19    A.   I could say yes.
20    Q.   Okay. And what does prepping work
21 involve?
22    A.   Prepping work involves hanging plastic,
23 taping plastic up, glue, plastic, using glue, duct
24 tape and hanging poly up is what it is. And

**Page 49**

1  sometimes there could be a little bit more detail
2  than what I just said too. I mean, they could --
3  cause remember now, you're building a containment
4  so...
5     Q.   And does hanging and taping require
6  Mrs. -- strike that.
7          When did you or did you report the fall
8  to Mr. Marinucci?
9     A.   Yes.
10    Q.   Do you recall when you did that?
11    A.   I believe the day it happened, and I
12 called my boss.
13    Q.   You were asked a question about a ramp
14 earlier. Do you recall the doorway in which
15 materials were brought in and out of the school?
16    A.   Yes.
17    Q.   And can you describe that to me?
18    A.   Well, actually we had to -- on the door
19 itself, it was a double door with a metal divider in
20 it, we took that out so we can get his equipment in
21 and out.
22         As far as the stairs go, he actually
23 used plywood, not a door.
24    Q.   So there -- if there were stairs in

13 (Pages 46 to 49)

DUANE JOSEPH CAMBY

**Page 50**

1  front of the door, they laid plywood over the stairs
2  to serve as a ramp; is that right?
3  A. Yes.
4  Q. On the forms that you filled out
5  there's a checkmark for tripping hazards; do you
6  recall that?
7  A. Yes.
8  Q. And what did that checkmark refer to?
9  A. When you're inside the containment,
10 don't trip over water hoses and slippery flooring
11 like when you -- when they loosen that mastic up to
12 take it off the concrete, it can get really slippery.
13 Q. Am I correct that you would point out
14 tripping hazards daily to Mr. Mahoney and his crew?
15 A. Well, that -- for the containment, yes.
16 Q. Did you attend the preconstruction
17 meeting on this site?
18 A. Yes.
19 Q. And can you tell me what type of a
20 walkthrough, if any, occurs at a preconstruction
21 meeting?
22 A. I want to say Andy Lannutti, I can't
23 remember his name, was there, representing Plymouth.
24 My boss, Wes Morrison, and myself. And I can't

**Page 51**

1  remember if John Marinucci was there or not. And
2  basically what we do is we walked around, trying to
3  figure out in assisting Plymouth in coming up with a
4  phasing as far as how we're going to do this in
5  phases and what we're going to do.
6  Q. And did that walk-around include the
7  exterior of the building?
8  A. No.
9  Q. On the quality assurance daily
10 checklist form that Harvard has, there's a spot that
11 refers to visual inspections outside the regulated
12 area. Can you tell me what that means?
13 A. That means right there it's a regulated
14 area. The regulated area is an area where it's
15 barricaded off to let you know not to walk in this
16 area, that's the regulated area. For example, maybe
17 right in front of the decon, D-E-C-O-N.
18 Q. And that's short for decontamination
19 area?
20 A. That's correct.
21 Q. On the same quality assurance
22 checklist, it says audit area and it says there's a
23 daily safety meeting. Can you tell me what that
24 refers to?

**Page 52**

1  A. Just talks about what I mentioned
2  before as far as talking about what are we going to
3  do today, how are we going to do it and stuff like
4  that. That's what that's supposed to represent.
5  Q. On one of the forms that you filled
6  out, let me get that, hang on a second.
7     It's one of your daily project activity
8  logs, I see a reference at one on July 1st. It
9  says -- at 15:30 it says, maintenance employees leave
10 the school. Can you tell me why you included that
11 entry?
12 A. No. Don't know why.
13 Q. I think that's all my questions.
14
15 REDIRECT EXAMINATION
16 BY MR. SNYDER:
17 Q. I just have one or two follow-up
18 questions and then we should be finished.
19    When you refer to a tripping hazard,
20 pointing out tripping hazards, was that limited to
21 the containment area?
22 A. That's correct.
23 Q. Okay. And as far as your knowledge,
24 was the yard sale of the furnishings and equipment

**Page 53**

1  open to the general public?
2  A. Yes.
3  Q. During your presence on the job site,
4  was any part of the exterior of the building either
5  restricted or barricaded from the general public?
6  A. No.
7  Q. Okay. Thank you. I have no further
8  questions?
9     MR. DOERLER: I have nothing further.
10    Thank you so much for cooperating.
11              * * * * *
12    (Whereupon a discussion was held off
13    the record.)
14              * * * * *
15    MR. SNYDER: Mr. Camby, you can have
16 the opportunity to read the transcript and
17 just check it over for any spelling errors or
18 any type of errors in the transcription of
19 your testimony, or you can just rely on the
20 court reporter's accuracy.
21    Would you like to review the
22 transcript?
23    THE WITNESS: No.
24    MR. SNYDER: Okay. That's fine.

DUANE JOSEPH CAMBY

54

1  With that, I guess we're finished.
2
3       * * * * *
4      (Whereupon the deposition was concluded
5  at 5:07 p.m.)
6       * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

55

CERTIFICATE

I, Anna Maria Fasciano, a Notary Public and Certified Shorthand Reporter of the State of New Jersey and Commissioner of Deeds of the Commonwealth of Pennsylvania, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I do further certify that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel and that I am not financially interested in this action.

_____
Anna Maria Fasciano, C.S.R.
Notary Public, State of New Jersey
My Commission Expires June 2, 2009
Certificate No. 30XI00200300
Commissioner of Deeds, Commonwealth of Pennsylvania
My Commission Expires September 24, 2007