

# WILCOX & FETZER LTD.

In the Matter Of:

# Mahoney
## v.
# Benjamin Banneker Elementary School and Milford School District

C.A. # 05-163 GMS

---

Transcript of:

John W. Marinucci

February 13, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com




EXHIBIT F

Case 1:05-cv-00163-GMS   Document 38-10   Filed 05/26/2006   Page 2 of 17

Mahoney                                                    v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci              C.A. # 05-163 GMS                    February 13, 2006

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4    JAMES MAHONEY and                   )
      TINA MAHONEY, h/w,                  )
 5                                        )
              Plaintiffs,                 )
 6                                        ) Civil Action
      v.                                  ) No. 05-163 GMS
 7                                        )
      BENJAMIN BANNEKER ELEMENTARY        )
 8    SCHOOL and MILFORD SCHOOL DISTRICT, )
                                          )
 9         Defendants, Third-Party        )
           Plaintiffs,                    )
10                                        )
      v.                                  )
11                                        )
      PLYMOUTH ENVIRONMENTAL CO., INC.,   )
12                                        )
           Third-Party Defendants.        )
13
14
15              Deposition of JOHN W. MARINUCCI taken
      pursuant to notice at the law offices of White and
16    Williams LLP, 824 North Market Street, Suite 902,
      Wilmington, Delaware, beginning at 10:10 a.m., on
17    Monday, February 13, 2006, before Kurt A. Fetzer,
      Registered Diplomate Reporter and Notary Public.
18
      APPEARANCES:
19
              MARC H. SNYDER, ESQ.
20            FRANK ROSEN SNYDER & MOSS, L.L.P.
                8380 Old York Road - Suite 410
21              Elkins Park, Pennsylvania  19027
                For the Plaintiffs
22
23                      WILCOX & FETZER
         1330 King Street - Wilmington, Delaware 19801
24                       (302) 655-0477
```

Case 1:05-cv-00163-GMS   Document 38-10   Filed 05/26/2006   Page 3 of 17

Mahoney                                                      v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci            C.A. # 05-163 GMS              February 13, 2006

Page 2

1  APPEARANCES: (Cont'd)
2      WILLIAM L. DOERLER, ESQ.
       WHITE AND WILLIAMS LLP
3        824 North Market Street - Suite 902
         Wilmington, Delaware 19801
4        For the Defendants and Third-Party Plaintiffs
5  ALSO PRESENT:
       JAMES MAHONEY
6      TINA MAHONEY
7          - - - - -
8              JOHN W. MARINUCCI,
9      the deponent herein, having first been
10     duly sworn on oath, was examined and
11     testified as follows:
12             EXAMINATION
13 BY MR. SNYDER:
14 Q. Good morning, Mr. Marinucci. My name is Marc
15 Snyder. We were introduced a few moments ago. As you
16 know, I'm the attorney for Tina Mahoney, who is
17 sitting to my left, and her husband Jim Mahoney, who
18 is sitting to her left.
19     We're here today to take your deposition
20 in large part because you have been identified through
21 the records and by your counsel as having information
22 which most likely will be relevant to my clients'
23 lawsuit against the Milford School District.
24     Have you ever had your deposition taken

Page 3

1  before in the context of your employment?
2  A. Yes.
3  Q. On approximately how many occasions?
4  A. Two.
5  Q. Were these personal injury cases?
6  A. No.
7  Q. Let me give you some instructions. You may
8  have heard these instructions before, but I ask that
9  you carefully listen to the instructions.
10     If there's any question that I ask that
11 you don't understand the question, please ask me to
12 repeat the question or rephrase the question until you
13 do understand the question.
14     Is that okay?
15 A. Yes.
16 Q. Also, like you're doing, allow me to finish my
17 question in its entirety and essentially take a pause
18 after I finish speaking so we're not speaking over
19 each other and, likewise, I will give you the courtesy
20 of allowing you to finish your answer in its entirety
21 so we're not speaking over each other and it allows
22 the court reporter to have an easier job and it makes
23 for a cleaner transcript.
24     Is that okay?

Page 4

1  A. That's fine.
2  Q. I'm going to be ask you questions about
3  incidents and some facts which occurred two to three
4  years ago. There may be some questions that you do
5  not know the answer to. Other questions you may have
6  known the answer to at one time, but you don't
7  remember the answer to.
8      I'm going to ask you not to guess and if
9  there's a question that you do not know the answer to,
10 please say, "I don't know" and that's the acceptable
11 answer.
12     If there's a question that I can ask you
13 maybe about a time or a date, you can provide an
14 educated guess, you can give an educated guess. Just
15 give a foundation for your answer.
16     Is that okay?
17 A. That's fine.
18 Q. I don't expect your deposition to last all that
19 long, but if for any reason you want to take a break,
20 just let us know and we will accommodate you.
21     Is that okay?
22 A. That's fine.
23 Q. Is there any reason you can think of why the
24 deposition should not take place?

Page 5

1  A. I can't think of any reason.
2  Q. Good. Okay. Your full name for the record?
3  A. John Walter Marinucci, M-a-r-i-n-u-c-c-i.
4  Q. For whom are you presently employed?
5  A. I'm working for the Department of Education in
6  the State of Delaware now. I do not work for the
7  Milford School District anymore.
8  Q. What is your position with the Department of
9  Education?
10 A. I'm the education associate for school plant
11 planning and maintenance. I handle school
12 construction and maintenance for the entire state.
13 Q. What's the business address there?
14 A. 401 Federal Street, Dover, Delaware. There's a
15 suite number. I don't remember what it is. I've only
16 been there four weeks.
17     Dover, Delaware, 19901.
18 Q. Before working for the Department of Education
19 in that capacity, who was your employer?
20 A. Milford School District.
21 Q. How long did you work for the Milford School
22 District?
23 A. I worked for the Milford School District as the
24 director of operations from June 1st of 2000 until

Case 1:05-cv-00163-GMS    Document 38-10    Filed 05/26/2006    Page 4 of 17

Mahoney                                                    v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci            C.A. # 05-163 GMS                          February 13, 2006

Page 6

1  January 9th -- I'm sorry -- January 6th of 2006.
2  Q.  Could you provide me a summary of your job
3  description as director of operations?
4  A.  My responsibilities were school construction.
5  I handled all the construction projects and at the
6  time we had four of the five schools were either under
7  construction, either total reconstruction or
8  renovations.
9  Q.  So it would be new construction or renovations?
10 A.  Yes, sir.
11 Q.  Okay.
12 A.  The technology department reported to me.  The
13 facilities aspect of food service, which is child
14 nutrition, reported to me.
15 Q.  How many schools are in the Milford School
16 District?
17 A.  Five schools and one administration building.
18     The maintenance department reported to me
19 as well.
20 Q.  Just briefly, what's your educational
21 background?
22 A.  I have a bachelor's degree in business
23 administration.  I have a master's degree in business
24 administration.  And I have a doctorate degree in

Page 7

1  educational leadership.
2     I'm a Certified Fraud Examiner and I'm a
3  Certified Internal Auditor.
4     I'm also a Certified Playground Inspector.
5  Q.  Aside from Mr. Doerler or anybody from his
6  office, have you spoken to anybody in preparation for
7  your deposition?
8  A.  No, sir.
9  Q.  Have you reviewed any documents in preparation
10 for your deposition?
11 A.  Yes.  I have reviewed the contract with Harvard
12 Environmental and I have reviewed some of the
13 documents from Harvard Environmental and some of the
14 documents between the school district and Plymouth
15 Environmental.  And that was with Mr. Doerler.
16 Q.  I sent out interrogatories.
17 A.  I would like to back up for a minute.
18     I have spoken with Wes Morrison from
19 Harvard Environmental about the case.
20 Q.  Who is Wes Morrison and when did you speak to
21 him and what did you speak to him about?
22 A.  I spoke to him about the case, about the nature
23 of the case and we met with Mr. Doerler in his office
24 about the case.

Page 8

1     When was that?  I can't recall the exact
2  date of that.  It was over the summer.  I would say
3  June, July, to gather information.
4  Q.  Who is Wes Morrison?
5  A.  The owner of Harvard Environmental.  I don't
6  know his exact title.  I think he might be the
7  president.
8  Q.  Have you spoken to Mr. Morrison since your
9  meeting with Mr. Doerler and Mr. Morrison back in the
10 summer about this case?
11 A.  No.
12 Q.  I sent out interrogatories, which is a fancy
13 word for questions.  You were identified as the lead
14 contact person for the school district on the asbestos
15 abatement program.
16 A.  Mm-hmm.
17 Q.  Is that accurate?
18 A.  Yes.
19 Q.  You were also identified as having knowledge of
20 the scope of the responsibility for Plymouth
21 Environmental and Harvard Environmental.  Is that
22 accurate?
23 A.  Yes.
24 Q.  You were also identified as having information

Page 9

1  regarding the bidding and contract procedures for the
2  project?
3  A.  Yes.
4  Q.  And you were also identified as having
5  knowledge as to the condition of the school when it
6  was turned over to Plymouth?
7  A.  Yes.
8  Q.  Explain to me, if you could, just give me a
9  general overview of the asbestos abatement program.
10 A.  I can't speak to 100 percent of what the
11 asbestos was in the building, but I do know that we
12 had some asbestos floor tile that had to be removed.
13 We had some asbestos insulation on pipes that was in
14 the walls that had to be removed.
15     And I can't recall what else was in the
16 building, but there may have been some other areas of
17 asbestos that needed to be removed.  There was some
18 asbestos, like a tarry substance in the gym floor,
19 underneath the floor that had to be removed.  I recall
20 that.
21 Q.  And when was the last time this school was used
22 for educational purposes?
23 A.  I don't recall the date of the last class, but
24 we finished school that year and we basically started

Case 1:05-cv-00163-GMS    Document 38-10    Filed 05/26/2006    Page 5 of 17

Mahoney                                                    v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci                  C.A. # 05-163 GMS                                February 13, 2006

Page 10

1 asbestos abatement right away after that. I mean
2 within a couple of weeks after that we started
3 asbestos abatement and then from there we started
4 tearing the building down. It didn't sit dormant for
5 even a couple of months. It went right away.
6  Q. Give me an idea of how large the school is.
7  A. It's about 65,000 square feet, roughly, 64,
8 65,000.
9  Q. One building?
10  A. Yes. It had been added onto several times, but
11 it was one building.
12  Q. Prior to this asbestos removal project, how
13 many asbestos projects were you previously involved
14 in?
15  A. Small jobs. Just a couple.
16  Q. And would this be for the small jobs, would
17 this be during your employment with the Milford School
18 District?
19  A. Yes.
20  Q. And if you could just elaborate a little bit?
21 What kind of jobs were you involved in?
22  A. Floor tile removal, we had floor tile removal
23 at our high school. We also had floor tile removal at
24 another elementary school. As we were performing a

Page 11

1 renovation at our high school, we found some Transite
2 panels that needed to be removed, which is a type of
3 insulating panel that has asbestos in it.
4  Q. Were either Plymouth Environmental or Harvard
5 involved in any of these prior jobs?
6  A. No, sir. We had other companies involved.
7  Q. Were the schools in the prior jobs -- I'm
8 inferring there were two prior jobs. Is that
9 accurate?
10  A. That I'm talking about, that I mentioned, yes.
11 I mean, the Milford School District had several, many
12 different abatement jobs, but I was directly involved
13 with three abatement jobs that I can speak of before
14 this one.
15  Q. Three jobs, okay.
16         In the prior three abatement jobs were the
17 schools renovated in each job?
18  A. Yes.
19  Q. Whose decision was it not to renovate this job,
20 the elementary school?
21  A. The Milford School Board. That decision was
22 made before I was hired by the school district.
23  Q. So before 2000 there was a decision that the
24 Banneker Elementary School was going to be not

Page 12

1 renovated?
2  A. A new school was going to be built and the old
3 school was going to be torn down, yes, sir.
4  Q. My review of the records that were provided to
5 me from your counsel indicate that there were five
6 phases to the asbestos abatement program.
7         Is that something that you're familiar
8 with?
9  A. Yeah. I mean, I can't speak to the phases
10 specifically, but yes.
11  Q. Do you have knowledge of what the first phase
12 was?
13  A. I don't recall the phases anymore. And we had
14 Harvard involved to provide oversight over the phases.
15  Q. Explain to me Harvard's role in all of this.
16  A. Delaware law requires that there be an asbestos
17 engineer to oversee the asbestos abatement contractor,
18 two different companies on site for an asbestos
19 abatement job, the engineer, the engineering firm and
20 the abatement contractor. Plymouth was the abatement
21 contractor. Harvard was the abatement engineering
22 firm.
23  Q. And on a practical level, what was Harvard's
24 role and responsibility in the abatement program?

Page 13

1  A. I'm not sure I understand your question.
2  Q. Who was on site from Harvard during the
3 abatement program?
4  A. As I'm sure your records indicate, a guy by the
5 name of Dwayne Camby.
6  Q. Do you have an understanding of what his role
7 was?
8  A. Quite frankly, I relied upon Harvard
9 Environmental to manage the asbestos abatement job.
10  Q. And Dwayne Camby was identified as the site
11 supervisor for Harvard?
12  A. Yes.
13  Q. Do you have knowledge of whether anybody else
14 besides Mr. Camby was on site for Harvard during the
15 asbestos abatement program?
16  A. Intermittently we would have job meetings and
17 occasionally Wes Morrison would be there, I would be
18 there, someone from DNREC would be there, but I don't
19 know that someone from Harvard was there other than
20 Dwayne throughout the job.
21  Q. The records that I have, and I'm referring to
22 what was Bates stamped as 0006, indicate that Plymouth
23 Environmental arrived on the site on June 30, 2003.
24         Does that sound about accurate?

Case 1:05-cv-00163-GMS   Document 38-10   Filed 05/26/2006   Page 6 of 17

Mahoney                                                    v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci              C.A. # 05-163 GMS                                    February 13, 2006

Page 14

1  A. That sounds about accurate.
2  Q. Prior to Plymouth Environmental arriving on the
3  site and after the school year, can you tell me what,
4  if any, work was done to clear the school of desks and
5  chairs and all the property, personal property within
6  the school?
7  A. We had to go through the school with someone
8  from the division of purchasing to identify the
9  property that would go to the division of purchasing
10 for redistribution to other state agencies or schools.
11 That property had to be loaded on trucks and
12 transported to division of purchasing.
13       There was a significant amount of kitchen
14 equipment that was not being transported to the new
15 school and that kitchen equipment had to go to the
16 division of purchasing. There was a significant
17 amount of property that was left in the school, old
18 desks and chairs and things like that, that the
19 division of purchasing did not want at their surplus
20 property area facilities. They gave us permission to
21 have kind of like a yard sale, so to speak, and we
22 invited the public to come and buy these desks for
23 five, six, ten bucks, whatever. And we donated those
24 proceeds to the PTA, PTO, whatever it's called, Parent

Page 15

1  Teacher Organization.
2  Q. When was this yard sale?
3  A. I don't recall the exact date of it.
4  Q. Was it before June 30 or after June 30?
5  A. Again, I don't recall the exact date of it.
6  Q. How often, if at all, were you on the job site
7  between June 30, 2003 and the date of Ms. Mahoney's
8  injury, which I believe was July 15th, 2003?
9  A. I was pretty curious on the progress of the job
10 site, of the job, so I was on the job I would say
11 probably two to three times a week throughout the
12 progress of the job.
13 Q. And when —
14 A. That's an estimate.
15 Q. That's fine.
16       And when you were on the job site the two
17 or three times a week, how long were you there for
18 each particular day?
19 A. Oh, my. I'm not sure. It would vary.
20 Anywhere from 15 minutes to a couple of hours,
21 depending on the nature of the conversations, the
22 nature of what was going on.
23 Q. What kinds of things would you do while you
24 were on the job site?

Page 16

1  A. Carry on conversations with Dwayne, carry on
2  conversations with Mr. Mahoney about the progress of
3  the job. At the time our maintenance people were,
4  early on our maintenance folks were removing certain
5  property from the building, such as fire
6  extinguishers, which could be used in the new
7  building, valves and sinks and things like that that
8  we may be able to salvage and use in another building.
9  I was helping with some of that.
10       Never did we go into any of the
11 containment areas, but we did remove some property
12 from the building, some fixtures from the building.
13 Q. Who was employed by the school district was on
14 the job site at the time you were there?
15 A. With my knowledge, it would have been me and
16 there would be four maintenance guys that would have
17 been, four maintenance employees that would have been
18 involved in removing, like I said, light fixtures,
19 various pieces of equipment that may have been
20 fixtures that we may have been able to use in another
21 building.
22 Q. What was Mr. Reid's position?
23 A. Mr. Reid is a -- he's still employed with the
24 school district. He's the chief custodian of the

Page 17

1  Banneker Elementary School.
2  Q. Do you have knowledge or understanding of how
3  frequently Mr. Reid was on the job site from June 30th
4  of '03 up until the date of Ms. Mahoney's injury?
5  A. I'm not sure. It would probably be best to
6  speak to him about that, and I'm sure you will. I
7  imagine he probably came to the old school for certain
8  things occasionally, but I think he spent most of his
9  time -- maybe I shouldn't, maybe I shouldn't guess.
10       But I imagine he spent most of his time in
11 the new building preparing it for kids for the next
12 school year.
13 Q. What about Mr. Reid's staff, do you have
14 knowledge of -- did you say there were four
15 custodians?
16 A. Mr. Reid and four custodians, right.
17 Q. Do you have knowledge of how frequently
18 Mr. Reid's staff was at the Banneker School, again the
19 same time period?
20 A. Again, I don't have a good recollection of how
21 often they were there.
22 Q. That's fine. I can ask Mr. Reid those
23 questions.
24 A. Yeah.

Case 1:05-cv-00163-GMS    Document 38-10    Filed 05/26/2006    Page 7 of 17

Mahoney                                                v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci           C.A. # 05-163 GMS                February 13, 2006

Page 18

1  Q. You referred to the containment area. Explain
2  to me what was the containment area.
3  A. Well, in an area where there's going to be
4  asbestos abatement they typically contain it with
5  plastic sheeting basically, tape up plastic sheeting
6  so that none of the particles escape and then have
7  large fans and filters that cause what they consider
8  negative air pressure and then basically draw air out
9  of that area. And you're only allowed in that area if
10 you have certain types of clothing on and certain
11 types of personal protective gear.
12 Q. Is it an accurate statement then that different
13 areas of the school would be under containment during
14 the different phases of the abatement program?
15 A. Absolutely.
16 Q. And who would run, who would be in charge, who
17 was in charge of the actual work being performed by
18 Plymouth Environmental?
19 A. Plymouth Environmental was in charge of the
20 work that they were performing.
21     And Harvard Environmental was in charge of
22 making sure that they followed Delaware law. That's
23 my understanding.
24 Q. Okay. Mr. Mahoney was in charge for Plymouth

Page 19

1  Environmental?
2  A. Mr. Mahoney was in charge for Plymouth
3  Environmental.
4  Q. Do you have knowledge of whether anybody
5  besides Plymouth Environmental employees were allowed
6  within the containment area? Was Mr. Camby or anybody
7  else from Harvard also allowed in the containment
8  area?
9  A. I don't have any direct knowledge of that.
10 Q. You said you had conversations with
11 Mr. Mahoney. How frequently did you have
12 conversations with him?
13 A. Probably once a week, a couple times a week.
14 It varied. As we were changing containment areas and
15 going to others, it would probably ramp up. We would
16 talk about changing areas. While they were involved
17 in an area, we wouldn't talk as much while they were
18 working.
19     And when the job was finished, we spent a
20 lot of time talking about the completion of the job.
21 At the beginning of the job we spent a lot of time
22 talking about the starting of the job.
23 Q. When an area was under containment would the
24 personal property and the fixtures be removed prior to

Page 20

1  it being under containment?
2  A. If there was personal property that had not
3  been removed before the containment, we did not seek
4  to remove that property. Let me back up a minute.
5      The personal property such as desks, such
6  as furnishings, things like that had to be removed
7  prior to any asbestos work. The fixtures that we
8  wanted to remove, for example, light fixtures, sinks,
9  things like that, water fountains, things like that
10 that we may have been able to use in another school,
11 if the containment had been set up and if the asbestos
12 work had been started and completed, quite frankly if
13 that work had started and been completed, we did not
14 consider that equipment or those fixtures something
15 that we were interested in having at any point. We
16 considered them a loss. We did not go after that. We
17 did not try to recover them.
18 Q. Do you have knowledge of who coordinated with
19 Plymouth Environmental to remove as much of these
20 items and fixtures as possible prior to the specific
21 area being under containment?
22 A. There really wasn't a lot of coordination as
23 much as it was Plymouth saying this stuff had to be
24 out of here. So we got all of the, we removed the

Page 21

1  furnishings and we basically stored the furnishings in
2  the gym until we were able to move the furnishings to
3  Delaware City, to the division of purchasing facility.
4  Q. Do you have knowledge as to whether or not
5  Plymouth Environmental had any responsibility to
6  remove any of the items or fixtures prior to
7  containment?
8  A. I'm not aware of that.
9  Q. That's fine.
10     Would it be your understanding that it was
11 the school district's maintenance staff that was
12 responsible for removing the items?
13 A. Maintenance and custodial staff. We sought to
14 have all of the personal equipment -- I'm sorry --
15 personal furnishings and furniture and things like
16 that, we sought to have all of that out of the areas
17 prior to Plymouth coming in.
18 Q. Was anybody else from the school district
19 besides yourself on the job site?
20 A. I do have knowledge of the superintendent
21 stopping by and checking on the job site once in a
22 while.
23 Q. And who was that?
24 A. Dr. Robert Smith, Bob Smith.

Case 1:05-cv-00163-GMS    Document 38-10    Filed 05/26/2006    Page 8 of 17

Mahoney                                                    v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci              C.A. # 05-163 GMS                              February 13, 2006

Page 22

1  Q. And how frequently was Dr. Smith —
2  A. I knew you were going to ask that. I don't
3  know. I can't speak to how often. It was not very
4  often.
5       Maybe -- I can't say. Once a week at the
6  most. That's a guess, a sheer guess.
7  Q. Do you attend any of Plymouth Environmental's
8  safety meetings?
9  A. No, sir.
10 Q. I was provided an area hazard assessment from
11 Harvard Environmental.
12      For the record, it's Bates stamped 85 and
13 there are several sequentially after 85.
14      Are these documents that you're familiar
15 with?
16 A. Only from having looked at them with
17 Mr. Doerler, yes. And they were provided to me at the
18 close of the job.
19 Q. Do you know who prepared this assessment?
20 A. No, I do not.
21 Q. Do you know the purpose of the area hazard
22 assessment?
23 A. No, I do not.
24 Q. Do you know if the area hazard assessment was

Page 23

1  an assessment for the interior only or it included the
2  exterior of the building?
3  A. No, sir, I don't.
4  Q. Would your answer be both before and after your
5  review of the document you're not sure if it was
6  interior or both interior and exterior?
7  A. Correct.
8  Q. Have you spoken to Mr. Camby at all about
9  Ms. Mahoney's lawsuit?
10 A. No. No.
11 Q. Have you done any other work with either
12 Harvard Environmental or Plymouth Environmental for
13 asbestos abatement aside from the Banneker School?
14 A. Not for asbestos abatement, no.
15 Q. Okay. What other kinds of work did you do with
16 Harvard?
17 A. I had Harvard prepare the three-year AHERA.
18 I'm not sure what AHERA stands for. I could look it
19 up.
20 Q. Is that an acronym for something?
21 A. Yes, it is.
22 Q. Could you spell it?
23 A. Excuse me for a minute.
24      A-H-E-R-A. Every three years schools have

Page 24

1  to have a three-year update to their AHERA, A-H-E-R-A,
2  plans, which is basically an asbestos management plan.
3  If the building was built before a certain date and
4  it's either known or presumed to have asbestos-
5  containing materials in it, then you have to have an
6  AHERA plan, an asbestos management plan. Every three
7  years those plans have to be updated.
8       I used Harvard to perform an update, a
9  three-year update to those plans and that was
10 completed probably about a year ago.
11 Q. I'm going to refer your attention to the
12 quality assurance daily checklist prepared by Harvard
13 Environmental beginning June 30, 2003.
14      For the record, it's Bates stamped 97 and
15 thereafter sequentially.
16      Is this a document that you're familiar
17 with?
18 A. Only from when they provided it to me at the
19 close of the job.
20 Q. What is your understanding of the purpose of
21 the quality assurance daily checklist?
22 A. I have really no knowledge of this job other
23 than -- or of this checklist other than from when they
24 provided it to me in the binder. At the close of the

Page 25

1  job they provided me with several binders of paperwork
2  and this was one of them.
3  Q. Did you discuss it with anybody?
4  A. Very briefly with Wes Morrison. When he
5  presented the final bill and the binders, he just kind
6  of went through the tabs and said, "These are your
7  quality assurance checklists, this is this, this is
8  this, it's all here so you're legal" pretty much is
9  what he was telling me. That's basically what I was
10 relying on him for.
11 Q. I was provided Harvard environmental daily
12 project activity logs starting with June 30, 2003 and
13 it appears to be prepared daily for my purposes or for
14 purposes of this litigation through July 15, 2003.
15      Are these logs something that you reviewed
16 on a daily basis?
17 A. No. Again, I didn't see these until the
18 conclusion of the job and they were provided in the
19 binder of the work, the binder summarizing the job
20 basically.
21      Quite frankly, I didn't read through every
22 one of them.
23 Q. Do you have knowledge as to whether there was
24 any expectation that either Harvard or Plymouth

Case 1:05-cv-00163-GMS    Document 38-10    Filed 05/26/2006    Page 9 of 17

Mahoney                                               v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci         C.A. # 05-163 GMS                                        February 13, 2006

Page 26

1  Environmental would inspect the exterior of the
2  building for possible exterior hazardous conditions
3  prior to them beginning phase one of the job?
4  A. I'm sorry? Could you please repeat that?
5  Q. Sure.
6       Was there any expectation by either you or
7  the school district that Plymouth Environmental or
8  Harvard would inspect the exterior of the building for
9  potentially hazardous or dangerous exterior
10 conditions?
11       MR. DOERLER: I object to form.
12       You can answer.
13 A. It was my expectation that Plymouth would
14 manage and control the job site.
15 Q. And would the job site based on your
16 expectation include the exterior of the Banneker
17 building?
18 A. Yes. Yes, the immediate exterior around the
19 building.
20 Q. And what do you mean by "the immediate
21 exterior"?
22 A. Well, when you start getting farther away from
23 the building it's unreasonable to expect that they
24 would maintain mowing the grass outside of the

Page 27

1  building, farther away from the building.
2  Q. And what is your expectation based on, what was
3  it based on? Was it based on anything in the contract
4  language?
5  A. The fact that when they came in and took over
6  the building, I mean it was their job site and they
7  were in control of the job site. They were basically
8  telling us when we had to have furniture removed from
9  various areas and we have to have this area cleared by
10 a certain time; we have to -- if there's any furniture
11 in this area, you know, it's got to be removed by this
12 time. It was pretty much their job site.
13      We, "we" being the school district and the
14 maintenance staff that I directed, we were pretty much
15 doing what they needed us to do to facilitate the job
16 that they were completing.
17 Q. Okay. Let's suppose a hypothetical, that there
18 was a storm where a tree fell on to the stairs, the
19 exterior steps. What would your expectation be as to
20 who would clean up and clear out that tree?
21      MR. DOERLER: I object to form.
22      You can answer.
23 A. Quite frankly, it depends on the steps that it
24 fell on.

Page 28

1  Q. Let's say for the purposes --
2  A. I'll tell you exactly what I mean. If it fell
3  on a set of steps that nobody was using, because the
4  building was going to be torn down I would have left
5  it there. And there were -- I mean, this building was
6  going to be torn down.
7  Q. Let's say it was steps, the steps that
8  Ms. Mahoney ultimately fell on. Would you have an
9  expectation of who would be responsible for clearing
10 out that tree?
11      MR. DOERLER: I object to form.
12 A. There were no trees in that area.
13 Q. Let's say it was other exterior stairs where
14 you would expect people to go up and down them, the
15 same question?
16      MR. DOERLER: Same objection.
17 A. I can tell you this. The entrances to the
18 building that Plymouth was using for egress to the
19 building in order to roll their equipment into the
20 building, Plymouth had taken a door off, I mean a door
21 off of one of the door frames. And the building was,
22 the original building was built in the twenties,
23 thirties. They had taken a hardwood door off of one
24 of the door frames and laid it down over the steps and

Page 29

1  was using that as a makeshift ramp to roll equipment
2  up into the building.
3       And that old door, as dangerous as that
4  was, stayed there for them to walk into the building
5  and to roll equipment in and out of that building.
6  Quite frankly, sir, they didn't seem to care.
7  Q. They didn't seem to care about the door serving
8  as a ramp or is that a broader statement that you're
9  making?
10 A. That's a broader statement.
11 Q. Why don't you explain that, please?
12 A. They didn't seem to care about job safety.
13 Q. What's your basis for saying that?
14 A. The door being used as a ramp.
15 Q. How long was this door being used as a ramp?
16 A. The length of the job because I recall them
17 using it as a ramp to get out also.
18 Q. Do you know whether you had any discussions
19 with anybody from Plymouth Environmental about your
20 belief that they did not care about job safety?
21 A. I did not have direct discussions with anyone
22 about whether they seemed to care about job safety.
23 Q. Did you have any indirect conversations with
24 anybody, with Harvard or any other entity about your

8 (Pages 26 to 29)

Case 1:05-cv-00163-GMS   Document 38-10   Filed 05/26/2006   Page 10 of 17

Mahoney                                       v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci         C.A. # 05-163 GMS                            February 13, 2006

Page 30

1  concerns about Plymouth?
2  A. I had conversations with Harvard.
3  Q. Who did you have conversations with?
4  A. Wes Morrison and Dwayne Camby.
5  Q. And when did you have conversations and what
6  were the substance of your conversations?
7  A. "Is that door safe" was one conversation I had
8  with either Dwayne or Wes. I don't recall who. And
9  as the job was progressing just various things as the
10 job was progressing. And I can't give specifics. I
11 apologize for that.
12 Q. Was this ramp on the steps that Ms. Mahoney
13 fell?
14 A. No, sir.
15 Q. Do you know when this door was used as a ramp
16 and for how long it was used as a ramp? Using the
17 frame of reference of Ms. Mahoney's accident that
18 occurred on July 15th, before or after?
19 A. It was used when they mobilized into the
20 building to roll their equipment into the building and
21 I recall it being used when they rolled their
22 equipment out of the building when they were
23 finished.
24 Q. Do you know whether Mr. Morrison or Mr. Camby

Page 31

1  had any conversations with anybody from Plymouth?
2  A. I do not. I do not.
3  Q. Getting back to my question a little while ago
4  about the hypothetical of a tree falling on the
5  exterior steps. And, again, I'm going to ask you that
6  question.
7     Do you have an expectation, did you have
8  an expectation of who would be responsible for
9  clearing that tree?
10    MR. DOERLER: I object to form. Which
11 steps are you talking about?
12    MR. SNYDER: Well, I believe Mr. Marinucci
13 testified that the steps that Ms. Mahoney fell on
14 there were no trees in that area. So I'm asking about
15 other steps that were actually used for people walking
16 up and down the steps.
17    MR. DOERLER: Same objection.
18 A. I would have no expectation of anyone to clear
19 those steps because those steps were not being used.
20 There was no expectation that those steps would have
21 been used because they didn't lead into the building.
22 Q. So are the only steps that were used to lead
23 into the building the steps that Ms. Mahoney fell on?
24 A. No, sir. Those steps that she fell on are

Page 32

1  steps that don't lead into the building.
2  Q. My question is if there were steps that led
3  into the building and if there was a tree that fell
4  onto those steps, what would be your expectation of
5  who would clear that tree?
6     MR. DOERLER: I object to form.
7  A. I'm really at a loss here, sir. And I'm not
8  trying to be difficult, but I'm really at a loss. You
9  seem to be hung up on a tree falling on steps and who
10 would clean it.
11    The bottom line is I don't know how to
12 answer your question because the steps that
13 Ms. Mahoney fell down, those steps don't go into the
14 building. There's no trees around it.
15 Q. Where did they lead?
16    THE WITNESS: Do you want to go there? Is
17 this okay?
18    MR. DOERLER: You can answer the question
19 where the steps lead to.
20    THE WITNESS: Do you have that schematic
21 of the building? Do you have that handy?
22    MR. SNYDER: Let's go off the record for a
23 moment.
24    (Discussion off the record.)

Page 33

1  BY MR. SNYDER:
2  Q. I was just provided this schematic of the
3  Banneker Elementary School and Mr. Marinucci indicated
4  that he would mark his understanding of where
5  Ms. Mahoney, where the steps were where Ms. Mahoney
6  fell.
7  A. (Witness complies).
8     MR. DOERLER: For clarification, I
9  believe --
10    MS. MAHONEY: There's a lower level.
11    MR. DOERLER: -- this (indicating) is the
12 gym, right?
13    THE WITNESS: Yes.
14    MR. DOERLER: Wait. Yes. That's the gym.
15    MR. SNYDER: Excuse me one minute. Can I
16 just talk to my clients outside for one moment?
17    MR. DOERLER: Sure.
18    THE WITNESS: Actually, I would like to
19 take a bathroom break if you would like to talk to
20 them here for a moment.
21    MR. SNYDER: That's fine.
22    (A brief recess was taken.)
23 BY MR. SNYDER:
24 Q. You drew your understanding of where the

Mahoney                                    v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci                C.A. # 05-163 GMS                          February 13, 2006

Page 34

1  exterior stairs were where Ms. Mahoney fell. Is that
2  accurate?
3  A.  Yes.
4  Q.  How many sets of stairs are you aware of that
5  provided entry into the building?
6  A.  There's a set of stairs somewhere here
7  (indicating) that went up to the loading dock, steps
8  here that went into this door. There was one step
9  here into this door. There were steps here, steps
10 here. I believe there was a step here, steps here and
11 there was another -- when I say steps, it could be one
12 step, it could be more. It could be two or three.
13      There was a lower level. I don't recall
14 exactly where it was. I believe it was served by
15 these steps (indicating). I don't recall exactly, but
16 there was a lower level that I believe was under here
17 and went partially here, like maybe this area and then
18 back this way. I don't recall exactly how far that
19 lower level was.
20 Q.  That's fine.
21 A.  Go ahead.
22 Q.  Where did the stairs that Ms. Mahoney fell on,
23 where did it lead to?
24 A.  If the pictures that I'm seeing and my

Page 35

1  understanding of those pictures...
2  Q.  Here's a photograph.
3      MR. SNYDER: Why don't we mark this
4  drawing as Marinucci 1 and we will mark this
5  photograph as Marinucci 2?
6  A.  Can I see that?
7  Q.  Yes. You can take a look at all of the
8  photographs. We can mark all of those.
9  A.  I want to make sure.
10 Q.  Why don't you gather your thoughts? We will go
11 off the record and then let me know when you're done.
12     (Discussion off the record.)
13     (Marinucci Deposition Exhibit Nos. 1
14 through 7, respectively, were marked for
15 identification.)
16 BY MR. SNYDER:
17 Q.  We have six photographs which were marked
18 Marinucci 2 through 7. I ask you to take a look at
19 those photographs and if you can just answer based on
20 either the photographs or your independent
21 recollection where the steps led to.
22 A.  Those steps led -- as you can see here, I drew
23 them out here. Those steps are right here
24 (indicating). They lead up this grade here. This

Page 36

1  grade here is a pretty steep grade. It leads up.
2  This is the grassy area and this would be the macadam
3  area here. They lead up that grassy area and the top
4  right here.
5      This here --
6  Q.  "This here"? Refer to the photographs.
7      MR. DOERLER: On the right of the
8  photograph.
9  Q.  It's Marinucci 3.
10 A.  Marinucci 3. This is the macadam area at the
11 foot of the steps.
12     MR. SNYDER: Let's go off the record for a
13 second.
14     (Discussion off the record.)
15     THE WITNESS: In the picture Marinucci 3
16 at the foot of the steps you can see as you follow the
17 steps up to the right of the steps you see a dumpster.
18 Just behind that dumpster is a loading dock for the
19 kitchen. This (indicating) is the kitchen area.
20     Referring to Marinucci 1, which is the
21 schematic floor plan of the building, the dumpster
22 which you see in the picture Marinucci 3 that I just
23 pointed out would be right here. I just drew it in.
24     So --

Page 37

1      MR. DOERLER: Just for the record, he drew
2  that on the top right-hand side of the stairs.
3      THE WITNESS: Thank you.
4      On the picture Marinucci 3 you go to the
5  top of the stairs and you see the doorway. These
6  steps don't lead into that door. There is, going back
7  to Marinucci 1, the schematic, there is a space
8  between the top of the stairs and that doorway which
9  is the width of the kitchen and a little bit of the, a
10 couple feet, a few feet of the dining area you can see
11 there, the school district actually used to back
12 specialized buses back up here and receive students
13 out of that doorway to transport special ed. students
14 from here out of that doorway. So cars parked in here
15 (indicating). This was a parking area. These steps
16 did not lead to the school.
17     So to answer your question earlier, if
18 something were to happen with these steps while we
19 were destroying the building, tearing down the
20 building, I probably would not seek to fix that
21 because these steps, there's no reason to use them to
22 get into the building.
23 BY MR. SNYDER:
24 Q.  Sitting here today, do you have knowledge of

Case 1:05-cv-00163-GMS   Document 38-10   Filed 05/26/2006   Page 12 of 17

Mahoney                                                    v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci           C.A. # 05-163 GMS                                        February 13, 2006

Page 38

1  the purpose of why Ms. Mahoney was using those steps?
2  A. I have no clue.
3  Q. Did you speak to anybody to get a clue?
4  A. I have no idea.
5  Q. So you have no idea --
6  A. No. I did not speak to anybody.
7      MR. DOERLER: Let him finish the question.
8  Q. I think you just answered. I want
9  clarification.
10     You did not speak to anybody to gain an
11 understanding of why Ms. Mahoney used the steps. Is
12 that accurate?
13 A. That's accurate.
14     MR. DOERLER: Can I just ask him to label
15 the kitchen that he was referring to on this drawing
16 so we know which one is the kitchen?
17     THE WITNESS: (Witness complies).
18 BY MR. SNYDER:
19 Q. Aside from removing some of the fixtures and
20 property from the school, what other types of things
21 was the maintenance staff doing at the school between
22 June 30th and July 15th that you're aware of?
23 A. I don't recall, quite frankly.
24 Q. Were they responsible for maintaining the

Page 39

1  grass?
2  A. We did maintain the grass outside of the
3  building. The maintenance department has what we call
4  a bat wing mower, large mowing equipment that's pulled
5  with an agricultural tractor basically and we did use
6  that for mowing the acreage of the site.
7  Q. If there was storm damage to one of the
8  exterior stairs that did lead to the building, whose
9  expectation would you have to clear up the storm
10 damage?
11     MR. DOERLER: I object to form.
12 Q. Again, between June 30th and July 15th.
13     MR. DOERLER: I object to the form.
14 A. There again, you know, it depends on the nature
15 of the storm damage. I would have worked with
16 Plymouth to find out whether we needed to use that
17 entrance, whether we could have locked that door and
18 used a different entrance.
19 Q. Say the entrance needed to be used.
20     MR. DOERLER: Same objection.
21 A. Then we probably would have made the necessary
22 repairs.
23 Q. And let's say an entrance that needed to be
24 used that there was some kind of vandalism where the

Page 40

1  railings were pulled out of the concrete?
2      MR. DOERLER: Same objection.
3  Q. Do you have an understanding of who would be
4  responsible to secure the railings to allow for safe
5  egress into the building?
6      MR. DOERLER: Same objection.
7  A. Again, it depends on whether or not those
8  stairways would be used. But, once again, if the
9  railings were removed to be able to get equipment into
10 the building, no, I wouldn't have repaired them
11 because the building was going to be torn down.
12     But if the railings were necessary for
13 people to be able to walk in and out of the building,
14 then I probably would have repaired them. But,
15 remember, this building was being torn down. There
16 wasn't a lot of foot traffic. This was a demolition
17 zone. It was not a zone for school kids. There was
18 an expectation that this was a demolition zone.
19     MR. DOERLER: I have a question, a
20 clarification of your hypotheticals.
21     Are you talking about repairs at any point
22 in time or repairs during the time that Plymouth was
23 on the site?
24     MR. SNYDER: During the time Plymouth was

Page 41

1  on the site.
2  A. That's why I am struggling with the answers
3  because this building was destined to be torn down.
4  Q. Do you know if anybody from the school district
5  did a visual inspection of the exterior prior to
6  Plymouth going on the site?
7  A. I was on site regularly, but there was not
8  necessarily a sign-off sheet saying yes, it's being
9  accepted in this condition.
10 Q. Did the public have access to the exterior of
11 the building during the time that Plymouth was on the
12 site?
13 A. It's a public building. The public had access
14 to all of the schools.
15 Q. So the public could not go inside the building
16 during the time Plymouth was on site. Is that
17 accurate?
18 A. They weren't supposed to.
19 Q. The doors were locked I'm presuming?
20 A. The building had been turned over to Plymouth.
21 They should have been locking the doors.
22 Q. I just want to refer your attention to
23 Marinucci 4.
24     And sitting here today, do you have an

Case 1:05-cv-00163-GMS    Document 38-10    Filed 05/26/2006    Page 13 of 17

Mahoney                                           v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci              C.A. # 05-163 GMS                February 13, 2006

Page 42

1  understanding of where Ms. Mahoney alleges that her
2  fall originated on these steps?
3  A. I do not have a clear understanding, no.
4  Q. I'll represent to you on the record that it was
5  the area where the concrete is broken up. You can see
6  it on the platform of say the middle steps.
7       MR. DOERLER: On the right-hand side?
8       MR. SNYDER: On the right-hand side. On
9  the right-hand side.
10 BY MR. SNYDER:
11 Q. Before today did you have an understanding of
12 whether it was the exterior steps as depicted in these
13 photographs where Ms. Mahoney alleges that she fell?
14      MR. DOERLER: I object to the form. I'm
15 not sure I understand the question.
16 A. I'm sorry. Could you rephrase the question?
17 Q. Sure.
18      Did you have an understanding that it was
19 the steps depicted in Marinucci 4 and really all of
20 these photographs where Ms. Mahoney fell?
21 A. Yes, I did. Not originally but as the lawsuit
22 progressed I became, I did gain that understanding.
23 Q. And you explained that these steps did not have
24 direct entrance, did not allow for direct entrance

Page 43

1  into the school. Is that accurate?
2  A. Yes.
3  Q. Notwithstanding that, were these steps used,
4  were they used at all to gain access either to the
5  parking area or the docking area prior to Plymouth
6  going on the site? Did people go up and down these
7  steps?
8  A. When the school was being used?
9  Q. Yes.
10 A. Yes.
11 Q. Did you speak to anybody or do you have any
12 understanding of how long the steps were in the
13 condition as depicted in these photographs, if they
14 were in fact in the same condition prior to June 30,
15 2003, which was the date that Plymouth arrived on the
16 site?
17      MR. DOERLER: I object to the form.
18 A. I'm not sure I understand your question.
19 Q. Let me ask that differently.
20 A. Yeah.
21 Q. Do you have an understanding of the condition
22 of these steps prior to Plymouth going on the site on
23 June 30, 2003?
24 A. I have a recollection of the steps.

Page 44

1  Q. What is your recollection of the steps?
2  A. The recollection of the amount of what I call
3  spalling, I don't recall it being that excessive.
4  Q. And by "spalling," you're indicating the area
5  where Mrs. Mahoney fell?
6  A. The broken up.
7  Q. The broken-up concrete?
8  A. (The witness nodded.)
9  Q. What is your recollection based upon?
10 A. Being at the building three, four times a day
11 during school while kids were using these steps.
12 Q. Kids would actually use those steps?
13 A. Yes, sir.
14 Q. When was the last time you used those steps
15 prior to Ms. Mahoney's accident?
16 A. The last day of school, which was the end of
17 May, first of June.
18 Q. Sitting here today, what is your recollection
19 of the steps, again referring to the area where
20 Ms. Mahoney fell, as of the last day of school?
21 A. I don't recall it being that broken up.
22 Q. Do you recall it being broken up at all?
23 A. Yes. I recall looking at Marinucci 4 my
24 recollection of -- actually, let me take a look at

Page 45

1  these. There might be one that's better.
2       Actually, there is.
3  Q. What are you referring to?
4  A. Marinucci 6. Actually, Marinucci 7 is better.
5  Sorry.
6       Marinucci 7, I recall the area of the
7  amount of where it's broken up to be from -- I don't
8  know, I don't know what the scaling is here.
9       MR. SNYDER: Let's go off the record for a
10 moment.
11      (Discussion off the record.)
12      MR. SNYDER: Let's mark that as 8.
13      (Marinucci Deposition Exhibit No. 8 was
14 marked for identification.)
15      MR. DOERLER: He can draw on this?
16      MR. SNYDER: Yes. That's fine.
17      MR. DOERLER: Why don't you rephrase your
18 question?
19      MR. SNYDER: Sure.
20 BY MR. SNYDER:
21 Q. The question was it was my understanding that
22 you were going to draw or diagram your recollection of
23 the extent of the broken concrete as of the last day
24 of school.

Case 1:05-cv-00163-GMS   Document 38-10   Filed 05/26/2006   Page 14 of 17

Mahoney                                                                v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci                    C.A. # 05-163 GMS                            February 13, 2006

Page 46

1  A. Right. On Marinucci 8 I'm going to draw a line
2  on the broken-up concrete as to the amount that I
3  recall towards the end of the school, and I don't
4  remember the last day of school, but towards the end
5  of school it was approximately like this (indicating).
6  Q. Just so I am clear, you drew a line. Would the
7  broken-up concrete be to the right of the line or left
8  of the line?
9  A. No.
10 Q. Why don't you just draw it? Let me know.
11     MR. DOERLER: Would it be helpful if he
12 circled the area that was damaged?
13     MR. SNYDER: Yes.
14 A. I will circle the damaged area.
15 Q. That's fine.
16 A. (Witness complies) The non-damaged area was
17 outside of the circle.
18 Q. For how long was the area that you encircled in
19 your words damaged?
20 A. I don't recall.
21 Q. If the school was not going to be demolished
22 would the disrepair of the steps, would the broken-up
23 concrete have been something that you would have
24 expected to have been repaired?

Page 47

1      MR. DOERLER: I object to form.
2      THE WITNESS: It's okay to answer?
3      MR. DOERLER: Yes.
4  A. I would have repaired it.
5  Q. That was my next question. I think you
6  answered it.
7      Would it have been your decision as to
8  whether or not this would have been, the steps would
9  have been repaired?
10 A. It would have been my decision. And I hesitate
11 to answer that because the funding that I would have
12 used to fix that there was some control over by the
13 school board, but I would have, I would have repaired
14 it because it was the larger projects that the school
15 board typically wanted to get involved in.
16 Q. Is this the type of repair that you would have
17 subcontracted out or would the school maintenance
18 staff have repaired it?
19 A. It depends on what the repair was. If it was
20 repairing what was in place, then I probably would
21 have had our people do it.
22     If it was tearing out the steps and
23 replacing them with new steps, I would have contracted
24 it out.

Page 48

1  Q. When did you first notice that the steps were
2  broken up in the approximate area that you circled?
3  A. I don't recall.
4  Q. Was there any consideration on your part to
5  repair the broken-up concrete that you observed?
6  A. No, sir.
7  Q. What was the basis for that?
8  A. Because the school was being torn down. It was
9  going to be replaced entirely and because the school
10 was being replaced.
11 Q. Did you have any expectation that there was
12 going to be foot traffic up and down the steps during
13 the course of the asbestos abatement program?
14 A. No, I did not.
15 Q. Just so I am clear, you did not expect there to
16 be foot traffic or that's something that you just did
17 not think about?
18 A. I neither thought about it, nor did I expect
19 that there would be.
20 Q. I don't want to put words in your mouth.
21 A. That's okay.
22 Q. You didn't think about it, but if you had
23 thought about it you wouldn't have expected there to
24 be? Is that accurate?

Page 49

1  A. I didn't expect there to be and now that I
2  think about it, I don't expect that there was.
3  Q. If this condition had existed on steps that you
4  did expect there to be people going up and down it,
5  would your decision to repair it have changed or
6  decision not to have repaired it have changed?
7      MR. DOERLER: I object to the form.
8  You're talking about going up and down it while
9  Plymouth is on site?
10     MR. SNYDER: That's correct.
11 A. No, sir. It wouldn't have changed because we
12 were tearing the building down. The building was a
13 demolition zone. This (indicating) -- the building
14 was a demolition site.
15 Q. Did you provide any notice to anybody either at
16 Harvard or Plymouth of your own observations that at
17 least part of the platform was broken-up concrete?
18 A. No, sir.
19 Q. If these were steps that led directly to the
20 school and you would have expected there to be people
21 traveling up and down the steps, would you have given
22 notice to either Harvard or Plymouth?
23     MR. DOERLER: I object to form.
24 A. Once again, the school was a demolition site.

Case 1:05-cv-00163-GMS    Document 38-10    Filed 05/26/2006    Page 15 of 17

| Mahoney | | v. Benjamin Banneker Elementary School and Milford School District |
|---|---|---|
| John W. Marinucci | C.A. # 05-163 GMS | February 13, 2006 |

Page 50

1  In passing I may have said be careful of those steps
2  if they were steps that went right into the building,
3  but I'm not quite sure how to answer that one.
4      Q.  When did you first learn of Ms. Mahoney's
5  accident?
6      A.  I'm not sure of the timing in relation to the
7  accident, whether it was that day, the next day or
8  couple of days later, but I did go on the site and
9  Dwayne Camby said that Tina Mahoney had fallen and had
10 hurt her knee I believe he said. I don't know if he
11 said leg or knee. I can't recall.
12         And I said, "Oh, is she okay?" He said,
13 "Well, she had to go to the hospital." I said, "Well,
14 is she okay?" He said, "Yeah. She came back to work
15 though." I said, "Oh, well, that's good."
16         But then I did see her back on the job.
17 Like I said, I can't remember if it was that next day,
18 that same day or the next day or, you know, within the
19 next couple of days, but she was on the job site with
20 a knee brace.
21     Q.  Did you speak to, ever speak to Ms. Mahoney
22 either --
23     A.  No, I did not speak --
24     Q.  Let me just finish.

Page 51

1        -- either about her accident or her
2  injury? Now you can answer.
3     A.  No, I did not speak to Ms. Mahoney.
4     Q.  Did you speak to either Mr. Mahoney or anybody
5  else from Plymouth either about Ms. Mahoney's accident
6  or her injuries?
7     A.  I think I may have mentioned to Mr. Mahoney "I
8  hope your wife's okay" or something like that, but it
9  was more of a casual, you know, pleasantry sort of
10 thing.
11    Q.  Did you speak to anybody about how they
12 believed the accident occurred?
13    A.  I spoke with Dwayne Camby about it. He said --
14 and I don't recall the details about it, but he said
15 that she tripped coming in the building or something
16 like that. He didn't give me the details about it.
17 Or at least if he did, I don't recall that.
18    Q.  What involvement, if any, did you have in the
19 drafting of the contracts with Harvard Environmental
20 which set the scope of Plymouth's work?
21    A.  I relied on Harvard to draft the contract.
22 It's Harvard Environmental.
23    Q.  Is there any part of the contract that you
24 believe insulates the school district from liability

Page 52

1  for accidents which occurred in the exterior of the
2  building during the time of the asbestos abatement
3  program which were incurred by a Plymouth
4  Environmental employee?
5          MR. DOERLER: Objection to form and
6  foundation.
7     A.  I'm going to have to defer to the contract and
8  legal counsel and the interpretation of the contract.
9     Q.  Okay. That's fine.
10         Sitting here today, do you have knowledge
11 or have you spoken to anybody who has given you any
12 insight as to what caused I'll call it the worsening
13 of the condition of the platform of the steps from
14 your recollection during the end of the school year
15 until these photographs were taken?
16    A.  No. I have not spoken with anybody about the
17 worsening of the steps condition and I have no
18 understanding or knowledge, nor have I thought about
19 it.
20    Q.  Sitting here today, do you have knowledge of
21 who used, who went down these steps aside from
22 Ms. Mahoney during that time period of June 30, 2003
23 until the date of Ms. Mahoney's accident?
24    A.  I do not have knowledge of the folks who may or

Page 53

1  may not have gone down the steps.
2          MR. SNYDER: Thank you. I have no other
3  questions.
4  BY MR. DOERLER:
5     Q.  I just have one or two questions.
6          You talked about mowing the grass earlier.
7  Can you explain where in relationship to the building
8  you were mowing?
9     A.  Yes. We would have been mowing some of what I
10 call acreage or bulk mowing which would have been a
11 distance away from the immediate proximity of the
12 building. Like I said, there were 18 acres on the
13 site and where the new building was being built, the
14 general contractor who was building that building was
15 responsible for the site around that building.
16         And there was really no mowing taking
17 place per se up and around the old building that I can
18 recall. And the maintenance forces were mowing the
19 acreage, which there's a basketball court and there
20 was a service road that went down towards a road
21 called Fourth Street and there was probably eight
22 acres or so of land that went from the school, maybe
23 six or eight acres of land that went from the old
24 building towards Fourth Street along the service road,

Case 1:05-cv-00163-GMS   Document 38-10   Filed 05/26/2006   Page 16 of 17

Mahoney                                                    v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci              C.A. # 05-163 GMS                           February 13, 2006

Page 54

1  on either side of the service road and we would mow
2  that.
3  Q. All right. So up around the building, say
4  within 15 or 20 feet of the building, was anybody
5  mowing that area while Plymouth was in there?
6  A. To the best of my knowledge, no. If it was,
7  Mr. Reid would be able to speak to that. I wasn't
8  directing the maintenance forces to.
9       MR. DOERLER: That's all the questions I
10 have.
11 BY MR. SNYDER:
12 Q. Who made the decision of where the cutoff mark
13 would be as to how close to the building the
14 maintenance would maintain and how close they would
15 not maintain?
16 A. There really wasn't a demarc. line, so to
17 speak, because there was construction going on all
18 around the building. And I can show you on one of the
19 pages and I will make that clear here. If you hand me
20 the package, I will show you.
21      On Marinucci 2, you can see along here
22 (indicating) that is, that fresh dirt along the -- let
23 me see. Let me show you. Let me describe. Along the
24 left-hand corner of the picture in Marinucci 2, do you

Page 55

1  see that?
2  Q. Yes. It looks like dirt.
3  A. Down the steps there's macadam and then there's
4  dirt up in the left-hand corner. That's all storm
5  water management construction that's taking place
6  where underneath the ground there were pipes going in
7  to transport storm water.
8       Beyond this (indicating), sorry, beyond
9  this (indicating) there was undisturbed grass that
10 needed to be mowed that we were mowing. There really
11 wasn't a clear demarc., if you will. It was outside
12 of the construction zone, if you will.
13 Q. Are you aware of anything in writing from any
14 of Harvard's logs or the school district's logs which
15 address your earlier testimony that you felt that
16 Plymouth Environmental was performing some unsafe
17 acts, specifically using the door as a ramp?
18 A. I'm sorry? Would you please rephrase that?
19 Q. Sure.
20      Is there anything in writing that you have
21 observed and you can point my direction to which
22 supports your testimony that you believe Plymouth
23 Environmental was engaging in what you characterized
24 as unsafe acts?

Page 56

1  A. I do not know if Harvard documented any of
2  that.
3  Q. Would it be your expectation if Harvard would
4  have felt Plymouth Environmental was engaging in
5  unsafe acts that they would have documented it?
6       MR. DOERLER: I object to form.
7  A. Yes.
8       MR. SNYDER: Thanks. I have no more
9  questions.
10      MR. DOERLER: I have one more mowing
11 question.
12 BY MR. DOERLER:
13 Q. Am I correct in saying that between the
14 macadam area at the bottom of the stairs where
15 Ms. Mahoney fell and the school district that while
16 Plymouth was in the building that area was not being
17 mowed?
18      MR. SNYDER: Objection to the form of the
19 question. Do you mean --
20 A. Show me on the picture.
21      MR. SNYDER: Do you mean just in this
22 location (indicating)?
23      MR. DOERLER: In the back of the school,
24 yes.

Page 57

1  BY MR. DOERLER:
2  Q. From this area (indicating) at the bottom of
3  the stairs which you have referred to as the macadam
4  area, and I'm looking at Marinucci 2, up to the
5  school, am I correct, is it your recollection that no
6  one was mowing this area of grass during the time that
7  Plymouth was in the school?
8  A. I did not direct that that be mowed. Mr. Reid
9  may have asked his forces from the school to mow that.
10 You can speak to him about that, but I am not aware of
11 it being mowed.
12      MR. DOERLER: I'm done.
13 BY MR. SNYDER:
14 Q. If there was an area in the parking lot that
15 you deemed to be dangerous or defective, broken-up
16 concrete, for example, or broken-up blacktop, would
17 that have been something that you would have expected
18 your maintenance people to repair?
19      MR. DOERLER: I object to form.
20      Are you talking about the parking lot here
21 (indicating) or the parking lot up where the loading
22 dock was or does it matter?
23      MR. SNYDER: It's more of a general
24 question.

Case 1:05-cv-00163-GMS    Document 38-10    Filed 05/26/2006    Page 17 of 17

Mahoney                                                    v. Benjamin Banneker Elementary School and Milford School District
John W. Marinucci              C.A. # 05-163 GMS                               February 13, 2006

Page 58

1  BY MR. SNYDER:
2      Q.  Where the personnel for Plymouth Environmental
3  and Harvard would park and if prior to June 30, 2003
4  you observed a condition that you believed was in need
5  of repair, would this be something that you would
6  authorize the school district to repair?
7          MR. DOERLER: I object to the form.
8      A.  Let me make sure. A parking lot of a school
9  that's going to be torn down with construction workers
10 or demolition workers who have experience and are used
11 to working around demolition zones, working in these
12 conditions regularly, no, I would not repair those
13 areas.
14         MR. SNYDER: Thanks.
15         MR. DOERLER: I have nothing further.
16         (Deposition concluded at 11:50 a.m.)
17
18
19
20
21
22
23
24

Page 60

REPLACE THIS PAGE
WITH THE ERRATA SHEET
AFTER IT HAS BEEN
COMPLETED AND SIGNED
BY THE DEPONENT.

Page 59

1          I N D E X
2  DEPONENT: JOHN W. MARINUCCI           PAGE
3     Examination by Mr. Snyder      2
      Examination by Mr. Doerler    53
4     Examination by Mr. Snyder     54
      Examination by Mr. Doerler    56
5     Examination by Mr. Snyder     57
6          E X H I B I T S
7  MARINUCCI DEPOSITION EXHIBITS         MARKED
8  1 Schematic of first floor of Banneker
     Elementary School               35
9
   2 through 7 Photographs           35
10
   8 Photographs                     45
11
   ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 60
12
   CERTIFICATE OF REPORTER              PAGE 61
13

Page 61

1  State of Delaware  )
                      )
2  New Castle County  )
3
4          CERTIFICATE OF REPORTER
5
        I, Kurt A. Fetzer, Registered Diplomate
6  Reporter and Notary Public, do hereby certify that
   there came before me on Monday, February 13, 2006, the
7  deponent herein, JOHN W. MARINUCCI, who was duly sworn
   by me and thereafter examined by counsel for the
8  respective parties; that the questions asked of said
   deponent and the answers given were taken down by me
9  in Stenotype notes and thereafter transcribed by use
   of computer-aided transcription and computer printer
10 under my direction.
11      I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12 examination of said witness.
13      I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16
17         Kurt A. Fetzer, RDR, CRR
           Certification No. 100-RPR
18         (Expires January 31, 2008)
19
   DATED: